**BATON ROUGE CONTRACTING COMPANY, Inc., a Louisiana Corporation, Plaintiff,**

v.

**WEST HATCHIE DRAINAGE DISTRICT OF TIPPAH COUNTY, Mississippi, et al., Defendants.**

**No. WC 6730.**

United States District Court
N. D. Mississippi, W. D.

Sept. 30, 1969.

See also D.C., 279 F.Supp. 430.

 

Fred B. Smith, Ripley, Miss., for plaintiff.

James M. McClure, Sr., of McClure, Fant & McClure, Sardis, Miss., for defendants.

## MEMORANDUM OPINION

ORMA R. SMITH, District Judge.

This is an action by plaintiff [1] to recover compensation for certain channel improvement work performed by plain-

---

1. Plaintiff, Baton Rouge Contracting Company, Inc. will be referred to in this opinion as the "Contractor". Plaintiff acted through its President in the transaction.

tiff for defendant.[2] The case was tried to the Court without a jury and is now for disposition on briefs.

The Owner is a drainage district created and operating under and by virtue of the laws of the State of Mississippi.[3]

On August 12, 1965, the parties entered into a written contract wherein the contractor agreed to construct approximately forty (40) miles of channel improvement work on Owner's drainage canal in Tippah County, Mississippi, according to plans and specifications prepared for Owner by the Soil Conservation Service, United States Department of Agriculture.[4] The Owner issued and published its invitation for bids for the work, to be performed in strict accordance with the terms, conditions, instructions, provisions, schedules, specifications and drawings prepared for Owner's use by SCS. The Contractor, being interested in bidding on the job, visited and inspected the site of the project. The Contractor, before submitting a bid, received a copy of the plans and specifications, and other bidding information, from the project engineer. In a visit to the office of Owner, prior to the letting of the contract, in discussing with the project engineer the nature of the work, the Contractor inquired of the project engineer if there was anything else about the work which Contractor should know, to which the engineer replied, "That's about it".

In preparing the project for bids a geologist of SCS inspected the project site and made seventy six (76) soil borings at different locations along the channel and spur inlets. The geologist made a report of his findings which included, inter alia, the results of the borings. In the report there is shown the kind, nature and type of soil and water level at each place where a boring was made. This information was transferred to the drawings for the project and, by the use of a soil boring legend shown on the drawing, the type, kind and nature of the soil and the water level are shown at intervals along the entire channel and spur inlets. The actual report of the geologist, as distinguished from the information transferred therefrom to the drawing, was not made available to Contractor or others bidding on the project.

The Contractor commenced the work on September 18, 1965, and completed the job December 16, 1966. On November 5, 1965, the Contractor requested that the work be accepted in two-mile increments, pursuant to a provision of the contract permitting this to be done. This provision is as follows:

"For the purpose of final acceptance, if requested by the Contractor, the completed channel excavation and spoil spreading will be divided into two (2) mile increments starting at the downstream end of the channel. Where the channel is less than five (5) miles in length, the entire channel will be completed before final acceptance."

Although the contract contained no provision therefor, the Contractor also requested that sections be taken daily, due to a large amount of sand being deposited in the main channel excavation.

The request to take daily sections was promptly denied by the Owner, who advised the Contractor that such was impractical, if not impossible, due to limited personnel available in its office for such work.

The Contractor started the excavation of the channel at the lower end, working upstream. The evidence shows that on January 12, 1966, the project engineer discussed with the job foreman the Contractor's request to take up the work in

2. Defendant, West Hatchie Drainage District of Tippah County, Mississippi, will be referred to in this opinion as the "Owner".

3. The Owner is created and operates a drainage district pursuant to the provisions of Chapter 7, Title 19, Volume 4 of the Mississippi Code, 1942 Annotated, Recompiled, as Amended.

4. The Soil Conservation Service is referred to in the opinion as "SCS".

two-mile increments, starting at the downstream end of the channel, as the contract provided. At that time the lower two-mile section was in need of some minor work in order to bring it up to specifications. The foreman was advised that when this work had been performed the Owner would begin accepting the work in two-mile increments, beginning at the downstream end of the channel. This work was not done, but the Contractor continued to work upstream.

The documentary evidence reflects a request made by the Contractor on September 8, 1966, when the job was about completed, that the work be taken up on two-mile increments measured downstream instead of upstream. This request was in the form of a letter to the Owner. The Contractor was notified by letter on September 13, 1966, that the work would be accepted in two-mile increments, and the Contractor should notify the Owner when the Contractor had completed a two-mile section which would meet specifications, whereupon a final inspection of the section would be made. The Contractor made no further request of the Owner in this regard. Thus, the two-mile increment method of taking up the work was never inaugurated. The job was accepted as a whole, when completed on the date above mentioned.

As the work progressed the Contractor experienced sliding, or caving-in of the channel bank. The Contractor employed two draglines, with booms of seventy-five feet, in the performance of the work. One dragline cut one side of the channel, and the other followed on the other side at from 400 to 1000 feet. As the first dragline moved upstream, cutting one half of the channel, the bank, at times, would slide, slough, or cave-in behind the dragline. When this happened, the dragline removed the dirt falling into the channel behind it, where within the reach of its boom. Dirt beyond that point was removed by the second dragline, which followed. The second dragline was faced with the same problem on its side of the channel, and removed the dirt falling into the channel within the reach of its

boom. That dirt which was beyond that point was not removed. No provision was made in the contract for payment to the Contractor for the removal of the dirt from the channel by the draglines on account of such slides or cave-ins. The Contractor claimed extra pay on account thereof.

The Contractor introduced evidence to show that the volume of the dirt just mentioned aggregated 153,894.5 cubic yards, and claims reasonable compensation for this work in the sum of $45,-521.99, based on a unit price of $0.2958 per cubic yard. The contract unit price for channel excavation is $0.1972.

After the Contractor completed the excavation of the channel and spur inlets, the Owner, before accepting the work, required the Contractor to go back over a portion of the channel and spur inlets and remove cave-ins, silt and sand which had accumulated there, so that the work might be brought up to specifications. The amount of dirt removed by the Contractor in this operation amounted to 52,750 cubic yards, for which the Contractor demanded extra pay in the sum of $45,698.26, based on an average unit price of $0.865 per cubic yard.

As early as December 1, 1965, the Contractor complained of the slides and cave-ins along the channel banks, demanding an adjustment in the contract price to compensate for this work, which the Contractor contended was not within the contemplation of the parties at the time the contract was made. On this date the Contractor wrote the Owner about this matter, and it is important to note that in the letter the Owner made this significant statement: "It appears from the boring sheets that this condition will continue as the work proceeds upstream". Thus, it is clear that the Contractor, at that time, at least, had ascertained from the boring information shown on the drawings that such slides or cave-ins were to be expected in the performance of the work. It was in this letter that the Contractor, for the first time, took the position that the 1:1 slope-design of the channel contained in the specifica-

tions and drawings was too steep for the channel and a channel with a flatter slope would be more desirable.

The Contractor complained periodically about the slides and cave-ins along the channel, and on occasions threatened to discontinue the work or leave the slide material in its new resting place, unless some method was established to pay Contractor for the alleged extra work.

The Owner countered just as vehemently to sustain its position that the slides or cave-ins did not constitute a latent condition that could not be anticipated in a contract of the nature involved in the controversy. The Owner continuously refused to consider payment of additional compensation for excavating the slides, and placed the Contractor on notice that at the time of final acceptance the channel must conform as nearly as practicable to the lines and grades shown in the plans and/or as staked.

Pursuant to the Contractor's request a review was made of the project by the project engineer to determine whether, in his opinion, the side slopes of the channel being excavated should be changed. On April 1, 1966, the Owner notified the Contractor, by letter, that based upon the report of the inspection made by SCS, the conclusion had been reached that the changing of the side slopes would not materially affect the sloughing and there appeared to be no reason for changing the channel design.

There is a great deal of evidence, in the case, as to the suitability of the side slopes as designed for the channel by Owner's engineers. There was testimony on the subject from experts on both sides. The evidence is conflicting. The Contractor contends that a flatter slope (1½ to 1) would have been proper and that the channel cut to this design would hold and not slide. On the other hand, the owner offered evidence to sustain its position that a steeper slope (1 to 1) is a proper design for the channel and that a great deal of the Contractor's trouble with slides and cave-ins resulted from the method used by the Contractor to make the excavation.

While the Contractor experienced difficulty in excavating the channel and spur inlets, as designed by the project engineer, by the method employed by it in accomplishing the work, the contract was performed and the work accomplished according to the plans, drawings and specifications within the time fixed for performance.

Thus, it is established that the contract entered into between the parties was one that could be performed. The Court does not feel called upon to reach a decision as to which design is the better, since it is the Court's opinion that if the channel was capable of enlargement by the design selected, the Owner had the right to select the design it considered would best serve its need.

The Contractor relies upon the general rule, as expressed in 13 Am.Jur.2d, Building, etc., Contracts, page 22 that "Where defects in the plans and specifications, the sufficiency of which is not warranted by the Contractor, necessitate extra work or materials to complete the contract, the contractor may recover therefor from the owner". In the case sub judice there does not appear to be any defect in the drawings or specifications. The fact that the work was successfully performed according to the plans, drawings and specifications, refutes the contention that the plans were defective because the side slopes were designed too steep. Hence, this rule is not applicable to this case.

Next, it is the contention of the Contractor that the evidence shows conclusively that the dragline operators excavated the channel and spur inlets to specifications, but the side banks would not hold and dirt caved into the channel, before the work was accepted; that since the work was done according to the plans, drawings and specifications, the Contractor should not be held responsible for the inadequacy of the design of the channel. The Contractor relies on

case law from many jurisdictions, three of which are Mississippi cases.[5]

These cases are not in point with the case sub judice. Here, the design of the channel and spur inlets was not defective or insufficient, as is shown by the fact that Contractor completed the work according to specifications.

Where the work performed is covered under the terms of the contract, there can be no recovery therefor as extra work. 13 Am.Jur. Building, etc., Contracts, § 19, page 22. The Contractor's liability is fixed by the terms of his contract, and he is obligated to perform according to those terms. 13 Am.Jur. Building, etc., Contracts, § 27, page 29. Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation because unforeseen difficulties are encountered. United States v. Spearin, 1918, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166; Brasher v. City of Alexandria, 1949, 215 La. 887,

---

5. The three Mississippi cases are: (1) Havard v. Board of Supervisors, 220 Miss. 359, 70 So.2d 875; (2) Trustees of First Baptist Church, Corinth, Miss. v. McElroy, 223 Miss. 327, 78 So.2d 138; and (3) Blue Bell, Inc. v. Cassidy, 200 F. Supp. 443, 1961, Northern District of Miss.

In *Havard* the contractor constructed a gymnasium for a school district. After the work had been completed and accepted there developed a defect in the floor. The contractor refused to make the repairs, contending that he constructed the building according to specifications furnished by the district; that the defect was the result of insufficient or defective design for which he was not responsible; and that he was not required to make the repairs. The court said:

"The general rule is that a construction contractor who has followed plans and specifications furnished by the owner, architect, or engineer, and which have proved to be defective or insufficient, will not be responsible to the owner for loss or damages which result after the work has been completed, solely from the defective plans and specifications, in the absence of any negligence on the part of the contractor or any express warranty by him as to the plans and specifications being free from defects."

In *First Baptist Church of Corinth*, the contractor installed the gas furnace in a new building constructed by the church. The church furnished the contractor with plans and specifications prepared by its architect. The contractor installed the furnace according to the plans and specifications, and the work was accepted by the church. Several years thereafter an explosion occurred in the chimney and the church sued the contractor for its loss, contending that the explosion was occasioned by negligence on the part of the contractor in installing the furnace. The court held that the contractor was not liable because the evidence showed that he installed the furnace according to the plans and specifications furnished to him by the church. In discussing the applicable rule of law the court said:

"The rule has become well settled, in practically every American jurisdiction in which the matter has been involved, that a construction contractor who has followed plans or specifications furnished by the contractee, his architect or engineer, and which have proved to be defective or insufficient, will not be responsible to the contractee for loss or damage which results solely from the defective or insufficient plans or specifications, in the absence of negligence on the contractor's part, or any express warranty by him as to their being sufficient or free from defects."

In *Blue Bell*, the claim against the contractor was bottomed on his alleged negligence in failing adequately to protect his work. The court held that the underlying cause of the partial collapse of the building was either faulty design of the footings or bad soil conditions, or both, for which the contractor did not have any responsibility. The court said:

"No case has been cited and none have been found, where a construction contractor who followed plans or specifications furnished by the owner's architects or engineers was held liable for the collapse of a building under circumstances such as those presented here. It is clear, however, by analogy at least, that a construction contractor in this state is not liable for a collapse of a building, in the absence of a warranty on his part, where he has followed plans and specifications furnished by the owner without a showing of negligence."

41 So.2d 819. One who makes a contract never can be absolutely certain that he will be able to perform it when the time comes, nor that he will be able to do the work for the amount of his bid. The risks fall upon his shoulders. Day et al v. United States, 245 U.S. 159, 38 S.Ct. 57, 62 L.Ed. 219; Weston v. State of N. Y., 262 N.Y. 46, 186 N.E. 197, 88 A.L.R. 1219.

■■■ In the case sub judice four contractors submitted bids for the work. The bids ranged from the Contractor's low bid of $319,648.20, to the highest $452,963.00. The plans, drawings and specifications were clear as to the work to be performed. Adequate information was reflected upon the drawings with reference to the kind and type of soil and water levels to be encountered. Before the bidding on the work it was the Contractor's duty to fully inform itself as to the nature and extent of the work to be encountered. This duty included one to analyze the information contained in the drawings with reference to soil conditions and water level. The Contractor was an experienced operator in the field, fully qualified to do the work. The side slopes were distinctly shown on the drawings. The Contractor should have contemplated that some sliding or cave-ins might be encountered in performing the work. After the controversy arose, plaintiff secured a copy of the report of the geologist. This was furnished to him by defendant. At the hearing it developed that the summary and recommendation page had been removed from the copy given plaintiff. It was indicated in the summary that the high water tables and new cuts would pass through fine grain saturated plastic soils and would present a risk during construction, as this type material would slump, especially under load from spoil. This observation alluded to a portion of the channel, and it was suggested that excavation procedures at this point should be carried out during the summer rather than the winter and spring months. The Contractor contends that the deletion of this page from the copy furnished to it was indefensible, that the failure to make the entire report available to the Contractor and others bidding on the project, before reception of bids, constituted fraud, and that the Owner should be held liable to the Contractor for the extra work required to perform the work. An examination of the report and summary page reflects that all of the essential information as to the nature and kind of soil and water levels along the channel was transferred to and entered upon the drawings. The Contractor, with the exercise of reasonable care, could have been fully informed as to all matters contained in the report. In fact, as mentioned above, long before the Contractor received the report, the Contractor appreciated the force and effect of the boring legend and entries on the drawings. This is indicated in the Contractor's letter of December 1965, to the Owner, hereinbefore mentioned. There is no merit in this contention.

Contract provisions obligated the Contractor to perform the work according to drawings and specifications prepared for the work.

Paragraph 12 of the General Provisions of the contract provides:

"12. CONDITIONS AFFECTING THE WORK

The Contractor shall be responsible for having taken steps reasonably necessary to ascertain the nature and location of the work, and the general and local conditions which can affect the work or the cost thereof. Any failure by the Contractor to do so will not relieve him from responsibility for successfully performing the work without additional expense to the Contracting Local Organization. The Contracting Local Organization assumes no responsibility for any understanding or representations concerning conditions made by any of its officers or agents prior to the execution of this contract, unless such understanding or representations by the Contract-

ing Local Organization are expressly stated in the contract."

Paragraph 11 of the General Provisions of the contract provides, in part, as follows:

"He shall also be responsible for all materials delivered and work performed until completion and acceptance of the entire construction work, except for any completed unit of construction thereof which theretofore may have been accepted."

Paragraph 17 of the General Provisions of the contract provides:

"17. RECORDS OF TEST PITS AND BORINGS

The Contracting Local Organization does not represent that the available records show completely the existing conditions and does not guarantee any interpretation of these records. The Contractor assumes all responsibility for deductions and conclusions as to the nature of rock and other materials to be excavated, the difficulties of making and maintaining the required excavations and of doing other work affected by the geology of the site of the work, and for the final preparation of the foundations for the spillway, dikes, and other structures."

Paragraph 6(d) of General Provisions —Claims—General Provisions Soil Conservation Service Form 43, provides:

"All material and work covered by progress payments made shall thereupon become the sole property of the Contracting Local Organization, but this provision shall not be construed as relieving the Contractor from the sole responsibility for all material and work upon which payments have been made or the restoration of any damaged work, or as waiving the right of the Contracting Local Organization to require the fulfillment of all of the terms of the contract."

In sum, the Court holds that the drawings and specifications prepared by SCS for the Owner were not defective or insufficient; that the work for which provision was made in said drawings and specifications was capable of performance; that the Contractor, by its solemn contract, agreed to perform the work in accordance with such drawings and specifications and to maintain the work until it had been accepted by the Owner; that the Contractor completed the work, as required by the contract and maintained the same until it was accepted by the Owner; and that the Owner is not obligated, by the contract or by law, to reimburse Contractor for extra work found necessary to complete the project.

THE SPUR INLETS

The channel design provided for the construction of 75 spur inlets. These were shown on the drawings at different locations along the channel. Two of the spur inlets were not constructed and of the 73 remaining inlets only 12 were staked out in the field by the engineer for construction as located on the drawings. The other 61 were moved to other locations on the channel for distances varying from a few feet to 4720 feet. The Contractor contends that 48 of these inlets were changed to less desirable locations from a standpoint of construction, and its costs of construction was materially increased. The Owner added 72 additional inlets, which the Contractor contends were much more expensive to construct than those originally shown on the drawings. Thus, the Contractor claims additional compensation for the construction of 120 spur inlets. The unit price in the contract for channel excavation was $0.1972 per cubic yard. The Contractor seeks to recover compensation on the basis of $0.4545 per cubic yard for 65,966.4 cubic yards involved in the construction of the inlets.

The contract contains three provisions which are involved in this controversy,

the interpretation of which is necessary to an adjudication of the issues.

Paragraph 3 of the General Provisions, contains, inter alia, the following:

"The Contracting Officer may, at any time, by written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract if within its general scope. If such changes cause an increase or decrease in the Contractor's cost of, or time required for, performance of the contract, an equitable adjustment shall be made and the contract modified in writing accordingly."

Paragraph 28 of the General Provisions provides:

"28 QUANTITY VARIATIONS

(a) Where the quantity of work shown for an item in the bid schedule, including any modification thereof, is estimated, no adjustment of the contract price nor of the performance time shall be made for overruns or underruns which are within 25 percent of the estimated quantity of any such item.

(b) For overruns of more than 25 percent, the Contracting Officer shall re-estimate the quantity for the item, establish an equitable contract price for the overrun of more than 25 percent, adjust contract performance time equitably, and modify the contract in writing accordingly; this clause to thereafter be applicable to the total re-estimated item quantity.

(c) For underruns of more than 25 percent, the Contracting Officer shall determine the quantity for the item, establish an equitable contract price therefor, adjust contract performance time equitably, and modify the contract in writing accordingly."

Item 7, Channel Excavation, contains this paragraph:

"7. ITEMS OF WORK AND CONSTRUCTION DETAILS

Items of work to be performed in conformance with this specification and the construction details therefor are:

*Channel Excavation*

This item shall consist of all excavation indicated on the drawings and 'New Channel' and 'Channel Enlargement'.

At locations designated on the drawings as spur inlets or at locations designated by the Engineer, existing drains or entrances of tributary creeks shall be excavated to the bottom width, grade, and slope shown on the plans except as otherwise authorized by the Engineer. This work shall be done at the time the main channel is excavated."

The project engineer agreed that the additional inlets were more expensive to construct than those shown on the drawings, and on January 27, 1967, issued a contract modification with reference to 54 of the 72 additional inlets. This modification was issued after the completion of the work, and at a time when the Contractor was insisting that a modification of the contract and an equitable adjustment should be made pursuant to Paragraph 3 of the General Provisions, supra. The Contractor was demanding $0.54 per cubic yard, and the project engineer insisted that $0.35 was an equitable figure.

The project engineer, treating spur inlets as a separate item in the bid schedule, for the purpose of Paragraph 28 of the General Provisions, supra, reasoned that the 72 additional inlets constituted an overrun on the item within the contemplation of said paragraph, and authorized a modification of the contract for 54 (75% of the 72 additional inlets) of the inlets. Consequently he issued a modification to cover the 54 inlets, and fixed the equitable contract price at $0.35 per cubic yard. The 54 inlets involved 17,734 cubic yards, and the project engineer authorized an additional payment of $2,709.76, calculated on $0.1528 per cubic yard, this being the difference between the equitable contract price of $0.35 fixed by him and the contract price of $0.1972.

A reference to the contract reflects that there is no separate item in the bid schedule for spur inlets. There is an item in the bid schedule for channel excavation. The evidence discloses that excavation of spur inlets is a part and parcel of the estimated quantity applicable to the item of channel excavation.

■ To the extent that a contract is susceptible of two constructions by reason of doubt or uncertainty as to the meaning of ambiguous language, it is to be construed most strongly or strictly against the party by whom, or in whose behalf, the contract was prepared. 17A C.J.S. Contracts § 324, page 217; Home Mut. Fire Ins. Co. v. Pittman, 111 Miss. 420, 71 So. 739; Globe Music Corp. v. Johnson, 226 Miss. 329, 84 So.2d 509.

■ When this well recognized and established rule of law is given effect, it is the opinion of the Court that paragraph 28 is not applicable to spur inlets as a separate item. When considered as a part of the item designated as "channel excavation", the cubic yards of dirt involved in the 72 additional inlets do not amount to a twenty-five percent overrun.

The parties are, therefore, relegated to Section three of the General Provisions for a determination of their rights. It is noted that this section provides that the contracting officer may, by written order, makes changes in the drawings and/or specifications of the contract, if within its general scope, and, when such changes are made and cause an increase in the Contractor's cost of, or time required for, performance of the contract, he is authorized to make an equitable adjustment.

■ Changes in the drawings and specifications were not made by the contracting officer, in writing, until the work had been fully performed. However, the Contractor performed the work and the contracting officer thereafter issued his written modification or change of the contract to cover a portion of the additional work. The Court is of the opinion that the Owner, having ac-cepted the fruits of the changes, is not in a position to complain that they were not evidenced by a written order or modification.

■ The Court finds from the evidence that the Contractor is entitled to an equitable adjustment of the contract price to cover the work required by the addition of the 72 spur inlets, and that the amount claimed by the Contractor of $0.4545 per cubic yard is a fair and reasonable price.

The evidence shows that the additional inlets involved 23,645 cubic yards, which at $0.4545 per cubic yard amounts to $10,746.65. The Contractor has been paid $0.1972 per cubic yard, or $4,662.79, and $2,709.96, by virtue of contract modifications issued by the Contractor Officer. The Owner, therefore, is indebted to the Contractor for the sum of $3,-374.10.

The construction of the 73 spur inlets called for on the drawings presents an altogether different question.

The evidence shows that 12 of the inlets were constructed at the exact location shown on the drawings; 15 were moved in location from none to 50 feet; 13—from 50 feet to 100 feet; 7—from 100 feet to 150 feet; 9—from 150 feet to 200 feet; 4—from 200 feet to 250 feet; 6—from 250 feet to 300 feet; 3—from 300 feet to 350 feet; 1—from 350 feet to 400 feet; 2—from 750 feet to 800 feet, and one 4720 feet.

The evidence reflects that 31 of the inlets were moved to higher elevations, and 33 to lower elevations. The elevations of the other 9 were not changed.

The changes in locations of the 73 inlets reduced the aggregate length of the inlets and the amount of excavation work necessary to be performed.

While the locations of the inlets were shown on the drawings, they had not been staked in the field at the time of the letting of the contract.

■ The contract provision with reference to items of work and construction details, supra, provides that the spur inlets are to be excavated at "locations des-

ignated on the drawings *or at locations designated by the engineer*".

The Court is of the opinion that the changes made by the project engineer in the locations of the several spur inlets shown on the drawings were fully authorized by the contract provisions aforesaid. The Contractor is not entitled to additional compensation for the work performed in constructing the original 73 spur inlets.

6. "CONSTRUCTION SPECIFICATION 200. CLEARING

"1. SCOPE
The work shall consist of the clearing and disposal of trees, snags, logs, brush, shrubs, stumps and rubbish from the designated areas.

"2. CLASSIFICATION
Clearing will be classified according to the following definitions:
\*　　\*　　\*　　\*　　\*

"*Class B clearing* requires that trees and other woody vegetation be so cut off that the remaining stumps extend no higher than 12 inches above the natural ground surface."
\*　　\*　　\*　　\*　　\*

"3. MARKING
The limits of the areas to be cleared will be marked by means of stakes, flags, tree markings or other suitable methods. Trees to be left standing and uninjured will be designated by special markings.

"4. CLEARING
All trees not marked for preservation and all snags, logs, brush, shrubs, and rubbish shall be cleared from within the limit of the marked areas."
\*　　\*　　\*　　\*　　\*

"*Method 3* For items of work for which specific unit prices are established in the contract, the cleared areas will be measured within the specified limits to the nearest 0.1 area.
"The cleared areas will be determined by measuring the width cleared, within the specified limits, at representative sections and multiplying the average width between sections by the linear distance between sections. Payment for clearing will be made at the contract unit price for the item and shall constitute full compensation for all labor, equipment, tools, and all other items necessary and incidental to the completion of the work."

## CLEARING FOR CHANNEL EXCAVATION—CLASS B

The Contractor's bid schedule, which is a part of the contract, contains an item of clearing for Channel Excavation—Class B. The quantity of this item is shown to be 421.8 acres, and the price @ $189.00 per acre, or $79,720.00. The contract provisions pertinent to this issue are set forth in the footnote.[6]

\*　　\*　　\*　　\*　　\*

"*Clearing for Channel Excavation, Class B*
This item shall consist of clearing of the length of channel indicated on the drawings as 'New Channel' or 'Channel Enlargement'.

"The average width of clearing is shown by stations in a table on the drawings. This width represents the average width at representative sections. Scattered trees, woody vegetation and other debris are not included in this average width. Clearing of all materials shall be done within the width designated as 'Area to be Cleared' on the typical section. The clearing shall be performed in such a manner that the completed clearing operation shall precede the excavation operation by at least 2,-000 feet unless otherwise authorized by the Engineer."

\*　　\*　　\*　　\*　　\*

"2. SPECIFICATIONS AND DRAWINGS
The Contractor shall keep on the work a copy of the drawings and specifications and shall at all times give the Contracting Officer access thereto. Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern. In case of discrepancy either in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing. Any adjustment by the Contractor without such a determination shall be at his own risk and expense. The Contracting Officer shall furnish from time to time such detail drawings and other information as he may consider necessary, unless otherwise provided."

The drawings, page 24, contain a table of average width of clearing for the main channel, laterals and spur inlets. This table reflects the stations along the project and the average width of each area designated to be cleared.

The acreage to be cleared for the entire project is shown in this table to be 421.8 acres.

The drawings do not designate the actual number of acres in each area to be cleared, nor the aggregate acres contained in them.

The Contractor asserts that the aggregate number of acres contained within the several areas to be cleared, as shown on the drawings, is 548.9 acres. The Owner claims to have made a correct calculation and tabulation of the several areas, resulting in the correct acreage being 496.7 acres. The Court has not made an independent calculation, since such is not necessary in view of the decision which the Court has reached. The correct figure is, however, capable of being ascertained from the information contained in the drawings.

The Bid Schedule, which is a part of the contract, contains an item for Class B Clearing for Channel Excavation. This item contains 421.8 acres at $189.00 per acre. The Contractor has been paid for 441.995 acres at the contract price of $189.00.

After the work started, the project engineer flagged the areas to be cleared. The contract provided that "scattered trees, woody vegetation and other debris are not included in the average width". However, in the course of the work the Owner agreed to pay the Contractor for the clearing of scattered trees, woody vegetation and other debris. The project engineers measured and designated the areas to be cleared pursuant to this agreement, and payment therefor was made by the Owner. The reasonable inference from the evidence is that scattered trees, woody vegetation, and other debris are not included in the average width of the typical sections to be cleared, (shown in the table of average width

as 421.8 acres). This additional acreage increased the acreage shown on the table to 441.995 acres, for which payment was made.

The Contractor contends that the Court should construe the contract to mean that the parties intended that the Contractor clear and receive compensation for all acres embraced within the typical sections shown on the drawings as the "area to be cleared," regardless of whether it was necessary for the entire area to be cleared.

If this construction, as pressed upon the Court by the Contractor, should be adopted, many of the contract provisions would serve no useful purpose. It is academic that a contract must be construed as a whole and, whenever possible, effect will be given to all of its parts. 17A C.J.S. Contracts § 297, page 107; Mitchell v. Eagle Motor Lines, Inc., 228 Miss. 214, 87 So.2d 466; Copiah Hardware Co. v. Johnson, 123 Miss. 624, 86 So. 369.

To begin with, if the Contractor's contention is correct that the parties intended for the Contractor to be paid for all acres within the boundaries of the areas to be cleared, shown in the typical sections on the drawings, it would have been a simple matter to have calculated the total acreage in the sections and inserted this acreage in the contract documents, as the acreage for which the Contractor would be paid.

In such event, there would have been no reason to prepare and include in the drawings the average width of clearings table on page 24 of the drawings, showing an estimated acreage of 421.8 acres. Such a construction renders this table meaningless.

As is indicated hereinbefore, the contract provided that areas to be cleared would be marked by stakes, flags, tree markings, or other suitable methods. Such a provision would be of no value and ineffective if the parties intended for the Contractor to receive payment for all acreage shown on the typical sections.

The same thing is true with reference to contract provisions, that, for the purpose of payment, the cleared areas would be measured within the specified limits to the nearest 0.1 area; that the cleared areas would be determined by measuring the width cleared, within the specified limits, at representative sections and multiplying the average width between sections by the linear distance between sections.

The contract contained the provision that "scattered trees, woody vegetation and other debris are not included in the average width". If the parties intended to pay for all acres within the designated section, this provision is meaningless and ineffective for any purpose.

It is evident that the Contractor intended to contract for the clearing of 421.8 acres, as estimated in the table of average width of clearing, or the Contractor would not have entered this figure in the Bid Schedule; but would have entered 548.9 acres said by the Contractor to be the aggregate acreage included within all typical sections on the drawings.

There are numerous differences in the acreage shown in the designs of typical sections on the drawings, and the table of average width of clearing for particular sections.

For example the drawings show a typical section on page 7, from Station 483+00 to Station 518+00 as having a width of 190 feet. The table of average width of clearing shows the average width as 112 feet. Another example is reflected on page 6 of the drawings. A typical section is shown there depicting the area from Station 380+00 to Station 473+00. The width of the area is given as 190 feet. The table of average width of clearing treats these sections as follows: Station 380+00 to Station 460+00 —190 feet average width; Station 460+00 to Station 472+00—150 feet; Station 472+00 to Station 473+00 is omitted.

Although these differences existed in the drawings and specifications, the matter was never submitted to the Contracting Officer for determination. The Contractor did not utilize the provisions of the contract which gave it the right to have this done. Paragraph 2, Specifications and Drawings. (See footnote 6.)

■■■ The Court is of the opinion and so finds that the plain provisions of the contract provide for payment to the Contractor by the Owner for acreage cleared, according to table of average width clearings shown on page 24 of the drawings, as flagged and staked by the project engineer; and that the Contractor is not entitled to additional compensation on account of *clearing*.

### INTEREST

■■■ The Owner admits an indebtedness to the Contractor of $4,305.04. The evidence shows that the Owner has tendered this amount to the Contractor on several different occasions. The Owner has always refused to accept the tender, although made without prejudice to the Contractor in asserting claims for additional compensation. Contractor's President testified that he would not accept the check to cover the final contract payment, although he knew that the Contractor's claims for extra or additional compensation were excepted from the coverage of the check, because he feared that an acceptance might prejudice the rights of the Contractor. Since the tender was without prejudice to the Contractor's rights, it is the Court's opinion that the Contractor is not entitled to recover interest thereon.

### SUMMARY

In sum, the Court holds that plaintiff is entitled to recover from defendant the sum of $7,679.14, with interest at six (6) per centum per annum from this date.

A final judgment will be entered in this action for the amount aforesaid.