302 So.2d 88

**COMMERCIAL CONTRACTORS, INC.,**
**a corporation**

v.

**SUMAR CONTRACTORS, INC., an**
**Alabama corporation.**

**SC 541.**

Supreme Court of Alabama.

Sept. 5, 1974.

Rehearing Denied Oct. 3, 1974.

John B. Scott, Jr., and Champ Lyons, Jr., Montgomery, for appellant.

William M. Acker, Jr., Birmingham, for appellee.

MADDOX, Justice.*

This appeal involves a dispute between a prime contractor and a subcontractor over a contract.

Commercial Contractors, Inc., appellant here, was the prime contractor for building a shopping center named Red Mountain Plaza in Birmingham. Sumar Contractors, Inc. had the subcontract for site grading and for other incidental work.

The shopping center site was located on the side of Red Mountain. Consequently, extensive cuts into the side of the mountain were required. As Sumar completed the grading, Commercial and other con-

---

* The writer of this opinion was not sitting when the oral arguments were presented. However, the writer has listened to tape re- cordings of the entire oral arguments. In fact, the writer has listened to some portions of the oral arguments more than once.

tractors were constructing buildings in the shopping center and paving the parking areas.

While Sumar was performing its grading and excavation contract, a series of slides occurred along one of the excavation cuts. Commercial hired an independent engineering firm to examine the site to determine the cause of the rock slides and the possibility of additional slides in the future. The engineering study concluded that the slides were primarily due to the nature of the topography. The study recommended that corrective measures should be taken to prevent future slides. Considerable evidence showed that the rock strata in the area of the shopping center was very unstable. The engineering study recommended "benching" of the cut into the mountain and pinning of the rock strata with steel rods. The study also recommended that a cut along the interstate highway should be reworked and that "gunite" should be applied in order to meet State Highway Department requirements. Commercial claims the grading subcontract required Sumar to complete the work as recommended in the engineering study. Sumar denied this. In any event, Commercial completed the work at considerable expense to it, and then withheld the balance due to Sumar under the subcontract.

Sumar later sued Commercial to recover the balance due it under the subcontract. Commercial filed a plea in short by consent together with a plea of recoupment—counterclaim. In its counterclaim, Commercial alleged that Sumar had failed to properly perform its work under the contract and had breached its contract in other respects. The case was tried before a jury, which returned a verdict for Sumar against Commercial. The trial court entered a judgment for Sumar against Commercial in the sum of $27,497.34 plus costs.

The central dispute was whether Sumar met its contractual obligation to perform the grading work in accordance with the provisions of the subcontract and with the general plans and specifications for the shopping center project. Commercial claims that the jury verdict for Sumar was contrary to the overwhelming weight of the evidence. Commercial's argument is based on these basic points:

1. The evidence shows that Sumar failed to obtain the slopes required by the plans and specifications.

2. The contract provided that the grading and excavation along the interstate should meet State Highway Department requirements and Sumar's work did not meet these requirements.

3. Sumar failed to perform its subcontract in a good and workmanlike manner.

It is undisputed that the subcontract provided for a one to four slope in an area north of the Woolco store in the shopping center. It is also undisputed that the contract required that Sumar "construct the backslope on the I-65 right-of-way in accordance with the cross sections prepared by the Alabama State Highway Department, copy attached."

On this point, Sumar contends:

" * * * [T]he testimony shows that the *plans furnished* by Commercial to Sumar for the greater part of the work along the interstate, to which the State objected because of slope, *did not show a required slope.*"

It is also undisputed that paragraph 5 of the contract between Sumar and Commercial provided, as follows:

"It is understood and agreed that this is a lump sum contract for job requirements as identified above. Subcontractor acknowledges that he has visited the site and apprized himself of all conditions, whether shown on the plans and specifications or not, including latent subsurface conditions, and agrees that the lump sum price set forth herein will be compensation in full for work performed by him regardless of any condi-

tions that may be encountered in the execution of the contract."

Sumar does not deny that it failed to obtain the one to four slope called for in the specifications. Sumar argues, however, that the evidence was abundant that the variation from the required slope along the parking lot was unimportant. Sumar contends, in brief:

"\* \* \* The testimony from all expert witnesses (including Commercial's expert, Mr. Payne) was the same: The variation in the slope had nothing to do with the complained of rock slides which were in fact caused by centuries of weathering, the inherent nature of the material, and loose material from adjoining land. All the witnesses were equally sure that regardless of the slope achieved or the method used to do the job (i. e. graded slope, benching, guniting, or pinning) the rock was going to slide. Furthermore, it is undisputed that the end point of this slope was dependent on the beginning point, and that Commercial was responsible for staking this beginning point, i. e. the boundary line with the adjoining property. From this evidence the jury could even have reasonably drawn the inference, as it did, that the failure to achieve the required slope was Commercial's fault, and/or that it was insignificant and insubstantial."

In short, Sumar claims that it substantially performed its contract and the jury was entitled to award damages under the evidence presented. Regarding Commercial's counterclaim, Sumar argues that the jury was entitled to find against Commercial because Commercial failed to prove any damage. The evidence does show that the owners of the shopping center had paid to Commercial the additional amount re-

quired for the corrective work—that is, the pinning and the guniting.[1]

Commercial's argument, summarized, is that the written contract was not ambiguous, that the evidence showed that Sumar failed to perform the contract as it agreed, and that it was entitled to recover against Sumar the sum required to correct the deficiencies in Sumar's work. Sumar counters that a jury question was presented and that the jury found in its favor. After reviewing the evidence, we accept Sumar's argument as being the more persuasive.

The shopping center was cut out of the side of a mountain. The plans and specifications called for retaining walls in certain places. On two of the cuts in question, the plans specified the slope. In one area, the slope was described by witnesses as "steep." There was overwhelming evidence that the degree of the slope was not what caused the rock to slide. It was the nature of the rock strata. The rock strata was such that "benching," "pinning," or "guniting" was required to make the area safe. Commercial, in effect, claims Sumar was responsible, under its subcontract, to make the slopes safe. Sumar disagrees. Sumar says that when retaining walls and benching or pinning are called for in a grading contract, these will be specified in the subcontract.

Commercial cites Baton Rouge Contracting Co. v. West Hatchie Drainage Dist., 304 F.Supp. 580 (N.D.Miss.1969) aff'd, 436 F.2d 976 (5th Cir. 1971), in support of its argument that a contractor who agrees to perform a contract according to plans and specifications is required to perform it —provided the contract is *possible* to perform.

■ Unquestionably, Sumar could have stabilized the work. Therefore, it was possible. The real question is whether Sumar

---

1. There is evidence in the record indicating that the owners of the shopping center, James and Emory Folmar, and Commercial, the prime contractor, operated out of the same office. Commercial's architect on the project testified that there was no formal billing from Commercial to the Folmars. "This was an inter-office bookkeeping transaction," the architect testified. In fact, James Folmar signed the prime contract both as owner of the shopping center and as president of Commercial.

agreed, in its contract, to stabilize it. Difficulty in the performance of a contract, of course, does not excuse nonperformance of it. But is that principle applicable here? We think not.

The *Baton Rouge Contracting Co.* case is persuasive. However, it can be distinguished. There, the case was tried by the court without a jury. In *Baton Rouge,* the trial judge made findings of fact adverse to the contractor's position. As we have already pointed out, the jury found for Sumar in this case.

The weight given to the findings of fact in the *Baton Rouge* case was accentuated by the Fifth Circuit on appeal. That court said [436 F.2d at page 976]:

> "In this case the plaintiff-contractor sued to recover the value of certain alleged extra work performed pursuant to a contract for river channelization. In a detailed and well-reasoned opinion Judge Orma R. Smith denied the principal item of recovery by holding that the additional work was mere difficulty in performance which *could have been foreseen before acceptance of the contract since defendants' plans and specifications adequately revealed the type of soil conditions to be expected.*" (Emphasis added.)

Commercial says:

> "The extra costs caused by these *unforeseen natural conditions* was, understandably, a tough thing to face up to. But it was a risk that Sumar had expressly assumed—and should have shouldered in a responsible manner." (Emphasis added.)

■ In *Baton Rouge,* the plans and specifications called for a slope, as the plans do in this case. In *Baton Rouge,* because of natural soil conditions, the desired slope was difficult to obtain. In *Baton Rouge,* extensive soil samples were provided to the contractor. The Court, in *Baton Rouge,* found, as a fact, that the contractor should have *foreseen* this difficul-

ty; therefore, it was a risk he had assumed under the contract. Sumar was furnished with core samples here. However, there was some testimony that the core sample would not have disclosed the instability of the rock strata, only its composition. The jury found for Sumar. There was sufficient evidence upon which the jury could have found that Sumar did not agree to pin and gunite the slopes in the absence of an express warranty to that effect.

■ As a matter of fact, there was testimony admitted, over objection, that in the industry, if a grading contractor is expected to "gunite," "pin," "bench" or build retaining walls, that these requirements will be spelled out in the plans and specifications. Sumar says that its agreement to obtain a one to four slope did not require it to "bench" and "pin" the rock strata. Commercial argues exactly the opposite. Sumar says that absent an express warranty by a subcontractor that the plans and specifications furnished by a contractor are sufficient, the subcontractor is not responsible for extra work necessitated by defects in the plans and specifications. 13 Am. Jur.2d, Building and Construction Contracts, § 19 (1964). This principle seems applicable here. Clauses, such as Clause 5 in Sumar's contract, which require contractors to visit the site, and to inform themselves of the requirements of the work do not make the contractor liable if the plans and specifications are inadequate. Cf. Bradford Builders, Inc. v. Sears, Roebuck & Co., 270 F.2d 649 (5th Cir. 1959).

■ The case was tried before a jury. We have examined the argued assignments of error and after an examination of the entire cause it does not appear that any error complained of has probably injuriously affected substantial rights of the appellant. Rule 45. The judgment is affirmed.

Affirmed.

HEFLIN, C. J., and MERRILL, HARWOOD and FAULKNER, JJ., concur.