¶ 1. This case involves the construction and interpretation of a written scholarship certificate issued by Appellee, Mississippi College, (hereinafter the "College") in 1871. In what originated as a fund raising drive begun in the 1850's, the College issued "scholarship certificates" in exchange for monetary donations of $500 or more. One of these certificates was issued to the great-great grandfather of the Appellant, David Weeks, in 1871. The certificate has been used a number of times over the years, but this litigation was brought about as a result of Mr. Weeks's attempt to use the certificate to send his wife to the College in 1991. David and Susan Weeks contended that the certificate entitled her to full tuition, fees, and expenses. Originally, the College refused to honor the certificate to any extent. The Weekses retained an attorney, and ultimately the College agreed to honor the certificate, but only to the extent of one free course per semester. The Weekses refused that offer, and Mrs. Weeks subsequently enrolled *Page 1084 
at another institution and was able to complete her education elsewhere.
 ¶ 2. As a result of the College's refusal to honor the certificate as a full scholarship, the Weekses filed a lawsuit for damages to themselves and seeking declaratory relief as to their children.
 ¶ 3. At the trial of this matter, the chancellor ruled that the certificate was valid but ambiguous. On the basis of historical evidence introduced at the trial, he held that the certificate entitled the user to the greater of $100 tuition credit or one course per semester. He also held that the Weekses failed to prove damages. This appeal was taken from that judgment. The appellee, Mississippi College, filed a cross-appeal, contending that the scholarship certificate violates the rule against perpetuities.
 FACTS ¶ 4. The certificate which is the subject of this lawsuit reads, in its entirety as follows:
 Mississippi College, Clinton, Hinds County, Mississippi. This is to certify that Dr. E. G. Banks of Clinton, having paid to the Mississippi College scholarship Note for the sum of Five Hundred Dollars with accrued interest, now he, the said Dr. E. G. Banks, his heirs, executors, administrators, or assigns are entitled to a Perpetual Scholarship in said Mississippi College. Witness the Signatures of our President and Treasurer, and the seal of the College at Clinton, this Twenty-Second day of July, 1871. Benj. Whitfield President, Walter Hillman, Treasurer, Board of Trustees [SEAL]
 ¶ 5. The handwritten words, "Personal Property of Laura A. Cabell" appear at the bottom of the certificate.
 ¶ 6. Mr. Weeks possesses the certificate, and the court below found that the certificate was authentic. It is undisputed that the certificate constitutes a contract between David Weeks's ancestor, Dr. E. G. Banks, and the College and, by its tenor, was assignable by the latter.
 ¶ 7. Mr. Weeks came into possession of the certificate in 1978 in the form of a gift from his maternal aunt, Evelyn Johnston. Mrs. Johnston apparently acquired possession sometime during 1967, after the death of her mother, Laura A. Cabell. Sometime after he came into possession of the certificate, Mr. Weeks had it mounted in plexiglass for the purpose of preservation. A genealogical history of the Banks family introduced at trial established that the original certificate holder, Dr. E. G. Banks, is a lineal ancestor of Mr. Weeks and his children, and Mrs. Cabell, and Mrs. Johnston. More specifically, Dr. Banks, born 1828 and died 1893 is the grandfather of Mrs. Cabell, born 1881, the great-grandfather of Mrs. Johnston, born 1902, the great-great-grandfather of Mr. Weeks and the great-great-great-grandfather of Mr. Weeks's children.
 ¶ 8. At the trial of this matter, the Weekses called Dr. Charles Edward Martin, the College's Professor Emeritus and former Vice-President for Academic Affairs, who was able to provide evidence regarding the history of the certificate in question, from a search of the College's minutes of the meetings of its Board of Trustees. The following actions are pertinent to this case:
4/5/1851 Authorized sale of scholarships at $500.00 each, "which will entitle the possessor to the privilege of sending a scholar as long as our charter endures, as also to sell release and convey such scholarship as any other species of property[.]
8/4/1851 Fixed rates of tuition at $3 "for the lower branches $4 for the higher per month[.]
12/6/1851 Resolved the Board's agent had discretion to receive subscription for scholarships for a term of years or otherwise, and discretion to draw notes bearing interest at the rate of 10 percent and at such times as the agent and parties may agree upon.
11/27/1852 Adopted forms for scholarship note and certificate.
1/3/1861 Stated: "Col. Welborn a committee to see Dr. E. G. Banks as to suit *Page 1085 
against college, brought by said Banks as administrator of Est. of G.G. Banks: Col Welborn to settle on the best terms possible."
6/29/1865 Raised tuition to $75.00 per annum "or more if President of college deem it judicious."
11/21/1865 Ordered Bro. Whitfield to see David Shelton in reference to the alleged payment to him of the G. G. Banks scholarship.
1/11/1866 Ordered Bro. B. Whitfield to have Shelton to examine whether the G. G. Banks scholarship has been paid.
6/1/1866 Reported seventy-eight scholarships paid in full, and partial payment on the remaining one hundred and seven; reported a judgment had been obtained on the G. G. Banks scholarship note but never executed, or paid.
10/25/1866 In reply to request of Dr. E. G. Banks, "ordered that suit will be withdrawn if said Banks pay up interest in full, also pay cost of suit and give a new note for principal with security for said note: said note to be paid up in full on Jan. 1, 1868." [emphasis in original]
9/3/1868 Voted to "give a Certificate of Scholarship to the estate of G. G. Banks."
1/1/1869 Voted that an appeal be made to scholarship holders to give up the use of same for three years.
1/5/1870 Dr. E. G. Banks presented his proposition for compromise; resolved "that it be proposed to Dr. Banks to pay $800 and surrender the Scholarship, or pay the whole amount and retain the scholarship."
4/4/1870 Authorized secretary to issue a certificate of scholarship to Dr. E. G. Banks.
6/25/1873 Authorized each Board member to secure as far as possible the cancellation of scholarships.
10/1873 Authorized correspondence informing [another scholarship holder] that he is entitled to send "but one scholar per year on his scholarship."
5/9/1876 Set college tuition at $60.00 per annum.
11/23/1891 Ordered a "matter of over charge on initiation fee brought forward by Dr. E. G. Banks "settled "according to contract when purchase of scholarship was made."
8/10/1923 Recognized the Banks Scholarship for tuition to the amount of Sixty Dollars ($60.00) per annum."
 ¶ 9. In more recent years, the College's records indicate that the College repeatedly honored the certificate for tuition in various amounts for various students whenever the certificate was presented or upon the written request of Mrs. Cabell or Mrs. Johnston. The College also honored the certificate when it was presented by David Weeks, as their agent.
 ¶ 10. The following is a chronology of events surrounding the use of the certificate by Mrs. Cabell, Mrs. Johnston and Mr. Weeks:
Summer 1963 $25.00 each term against charges to Mr. Weeks, as student, of $48.45 in first summer term and of $93.90 in the second summer term, for the two courses he took that summer.
Fall 1972 $100.00 against tuition and fee charges to Mr. Weeks, as student, of $98.95 for the one course he took that semester.
Fall 1972 $100.00 for Ms. Johnston's assignee Jerry Farella, pursuant to her handwritten note that he "has had all the authority to use the Banks scholarship since the start of his enrolment [sic] at Mississippi College to the present date."
Fall 1974 $100.00 for student Bobby James Cook,
Spring 1975 $100.00 for student Bobby James Cook,
Fall 1975 $100.00 for student Clyde Cranford.
Fall 1976 $100.00 for student Jay Sudduth.
Spring 1977 $50.00 for student Bryan Robbins.
 ¶ 11. There was also a memorandum offered into evidence dated April 3, 1972 from the College's then-business manager, Mr. L. M. Lanier, to then-president, Dr. Lewis Nobles, informing him as follows:
 As far as I can tell from the audits, the Banks Scholarship is the only one that has been honored. In 1934, it shows up as a separate item for $100. We have honored it since I have been in the office when called upon. Mrs. Cabell would sell it each year at a discount. It has been increased to $200 because of the additional tuition cost and I don't have the date on this, but it was this figure in 1961.
 ¶ 12. Mr. Weeks testified that he used the certificate, as a student, for individual courses from the College in 1959 and 1961.
 ¶ 13. After Mr. Weeks acquired possession of the certificate in the late 1970's, he met with Dr. Nobles concerning the certificate. *Page 1086 
Dr. Nobles informed Mr. Weeks, at that time, that the College would no long honor the certificate because there was no money for the scholarship and because the scholarship did not bind the College. No one attempted to use the certificate during the 1980s.
 ¶ 14. In August 1991, Mr. and Mrs. Weeks informed the College of their desire to secure "full use" of the certificate for members of their immediate family. This information was relayed to the College in a letter from the Weeks's attorney dated August 28, 1991.
 ¶ 15. A year later, on August 13, 1992, Mrs. Weeks sought admission, as a full-time undergraduate student at the College, by written application. At the same time, she sought to have all of her educational expenses covered by the certificate as an heir or assign of Dr. Banks. Undergraduate tuition, at that time, was $2,505 per semester, based on 15 semester hours at $167.00 per hour. Adding to that amount the cost of fees, room and meals, the total expenses per semester for a full-time undergraduate student was $3,923 (five-day meal plan) or $3,968 (seven-day meal plan).
 ¶ 16. Mrs. Weeks's application for admission was given conditional approval in a letter from the College dated August 19, 1992. The College reserved its response to her request for full scholarship status under the certificate until later. Subsequently, Dr. Tom Prather, the College's then-director of Financial Aid, orally informed Mr. Weeks that the certificate would afford her one course per semester. Mrs. Weeks then sought admission and completed her education elsewhere, earning a bachelor's degree in English. At the time of the trial she was employed as an English teacher.
 ¶ 17. The parties stipulated that Mr. Weeks sought no counseling or treatment for the mental and emotional distress he claims to have suffered as a result of the College's refusal to grant his wife a full scholarship. Mr. Weeks does take over-the-counter medication for an ulcer problem that dates from the 1960s. Mrs. Weeks testified that the stress of this litigation exacerbated her asthma problems and disconcerted her in social interactions with persons associated with the College and in her attempt to plan her college education.
 ¶ 18. On the day of the trial, Mr. and Mrs. Weeks's eldest child, Tracey, born June 1, 1978 was a sophomore at Mississippi State University, studying mechanical engineering. Their younger children, Stephen, born April 8, 1981, and John, born December 8, 1983, are not yet of college age and reside at home.
 STANDARD OF REVIEW ¶ 19. What we are presented with here is essentially a question of law. The manifest error/substantial evidence rules have no application to our appellate review of such questions. The principle of "manifest error" applies only to a factual situation. If the chancellor is manifestly wrong in basing his decision upon the facts, then this court will reverse; otherwise, we will affirm. This rule does not apply on questions of law. Cole v.National Life Ins. Co., 549 So.2d 1301, 1303 (Miss. 1989) (citingBoggs v. Eaton, 379 So.2d 520, 522 (Miss. 1980)); MississippiState Highway Commission v. Dixie Contractors, Inc.,375 So.2d 1202, 1206 (Miss. 1979); S A Realty Co. v. Hilburn,249 So.2d 379, 382 (Miss. 1971)). "With regard to a pure question of law, this Court shall conduct a de novo review." Cole,549 So.2d at 1303
 ISSUES I. WHETHER THE CHANCELLOR ERRED, AS A MATTER OF LAW, IN APPLYINGOR FAILING TO APPLY RECOGNIZED LEGAL RULES OF INTERPRETATION ANDCONSTRUCTION OF CONTRACTS, IN FINDING THAT THE BANKS SCHOLARSHIPCONTRACT, ISSUED BY MISSISSIPPI COLLEGE IN 1871, INTENDED *Page 1087 THAT THE SCHOLARSHIP RIGHTS BE LIMITED TO A TUITION CREDIT OF $100 OR ONE(1) FREE THREE-HOUR COURSE PER SEMESTER:
a. BY FAILING TO APPLY THE RULE THAT ANY AMBIGUOUS TERMS OFWRITTEN CONTRACT SHOULD BE CONSTRUED MOST STRONGLY AGAINST THEDRAFTER; AND
b. BY FINDING ACTIONS OF APPELLANT'S PREDECESSORS IN INTEREST, INTHE 1970s AND 1980s, OVER 100 YEARS AFTER ISSUANCE OF THE BANKSSCHOLARSHIP CONTRACT, IN ACCEPTING $100 PER SEMESTER, WERE MOREPERSUASIVE IN DETERMINING THE ORIGINAL INTENT OF THE PARTIES THANTHE WORDS OF THE CONTRACT AND ORIGINAL BOARD OF TRUSTEES'CONTEMPORARY MINUTES CLEARLY STATING THE INTENT OF THE COLLEGETHAT THE SCHOLARSHIP ALLOWED HOLDERS TO SEND A STUDENT TO THECOLLEGE, IN PERPETUITY, "FREE OF TUITION".
II. WHETHER THE CHANCELLOR ERRED IN REFUSING TO AWARD DAMAGES TOAPPELLANTS, DAVID AND SUSAN WEEKS, RESULTING FROM APPELLEE,MISSISSIPPI COLLEGE'S, REFUSAL TO HONOR THE SCHOLARSHIP.
III. WHETHER THE SCHOLARSHIP CERTIFICATE VIOLATES THE RULE AGAINSTPERPETUITIES.
 DISCUSSION OF THE LAW I. DID THE CHANCELLOR ERR, AS A MATTER OF LAW, IN APPLYING ORFAILING TO APPLY RECOGNIZED LEGAL RULES OF INTERPRETATION ANDCONSTRUCTION OF CONTRACTS, IN FINDING THAT THE BANKS SCHOLARSHIPCONTRACT, ISSUED BY MISSISSIPPI COLLEGE IN 1871, INTENDED THAT THESCHOLARSHIP RIGHTS BE LIMITED TO A TUITION CREDIT OF $100 OR ONE(1) FREE THREE-HOUR COURSE PER SEMESTER:
a. BY FAILING TO APPLY THE RULE THAT ANY AMBIGUOUS TERMS OF AWRITTEN CONTRACT SHOULD BE CONSTRUED MOST STRONGLY AGAINST THEDRAFTER.
 ¶ 20. The Weekses begin their argument on this issue by contending that the scholarship certificate is a contract between the College and Dr. E. G. Banks, which should be interpreted in accordance with traditional principles of contract law. Citing Griffin v.Tall Timbers Dev., Inc. 681 So.2d 546 (Miss. 1996), they argue that the words and language used in the contract are the surest indicators of the parties' intent and, where clear and unambiguous, must be enforced as written. That case involved the interpretation of restrictive covenants running with the land. The obvious difference between that case, and the one at bar, is that the court, in that case, made the determination that the covenants were clear and unambiguous. "When a contract is clear and unambiguous on its face, its construction is a matter of law, and not fact, and must be construed and enforced as written." Griffin,681 So.2d at 551. Just the opposite was true in this case. The chancellor found, and it was undisputed, that the contract term "scholarship" was ambiguous and required construction.
 ¶ 21. The Weekses argue that the chancellor found that the term "scholarship" was ambiguous, in that it could mean either "full" scholarship rights of free tuition, fees and expenses of attending college, or some lesser or limited amount thereof. Under these circumstances, they argue, the applicable rule is the one stated in Baton Rouge Contracting Company v. West Hatchie DrainageDistrict of Tippah *Page 1088 County, 304 F. Supp. 580, 589 (N.D. Miss. 1969):
 To the extent that a contract is susceptible of two constructions by reason of doubt or uncertainty as to the meaning of ambiguous language, it is to be construed most strongly against the party by whom, or in whose behalf, the contract was prepared. (citations omitted).
 ¶ 22. As drafter of the contract, the Weekses contend, the College could have, but did not, place any limitations on the grant of the "scholarship" it desired. Having failed to do so, the rule of ambiguous construction requires that the term be given its common meaning construed most strongly against the College, and in favor of the recipient: i.e., that it intended to grant a "full" scholarship of free tuition, fees, and necessary expenses, rather than some limited amount. Since, they argue, the chancellor failed to apply or even mention this cardinal rule of contract construction, such failure constitutes error as a matter of law. This Court disagrees.
 ¶ 23. The great fallacy of their argument is their claim that the chancellor found that the term "scholarship", in its ambiguity, meant either "full" scholarship rights of free tuition, fees and expenses of attending college, or some lesser or limited amount thereof. The chancellor only found that the term was ambiguous. Having made that determination, he then found it proper, in construing the term "scholarship", to accord considerable weight to the evidence of the actual performance of the contract. This Court finds that, as a matter of law, it was proper for him to so rule. Dossett v. New Orleans Great Northern R. R. Co. et al.,295 So.2d 771 (Miss. 1974). This, so-called, "practical construction" rule of interpretation was applied by the Mississippi Supreme Court in St. Regis Pulp Paper Corp., et al. v. Floyd,238 So.2d 740 (Miss. 1970), where it held that the interpretation placed upon the instrument by the original contracting parties and by their successors deserves consideration:
 It has long been an established rule of law in this state that where, as is urged here, some ambiguity exists, which pro arguendo we consider, the interpretation placed upon the deed by the grantees and their successors in title deserves and merits consideration here insofar as intent is concerned. . . . In the case at bar the original grantee, Bullard, and his successors in title have considered this a deed to merchantable timber or a timber deed, and under the Mississippi rule the intention of the parties is controlling. (citations omitted).
 ¶ 24. This Court finds no error in the chancellor's holdings on this issue.
 I(b). DID THE CHANCELLOR ERR, AS A MATTER OF LAW IN FINDING THE ACTIONS OF APPELLANT'S PREDECESSORS IN INTEREST IN THE 1970s AND 1980s, OVER 100 YEARS AFTER ISSUANCE OF THE BANKS SCHOLARSHIP CONTRACT, IN ACCEPTING $100 PER SEMESTER, WERE MORE PERSUASIVE IN DETERMINING THE ORIGINAL INTENT OF THE PARTIES THAN THE WORDS OF THE CONTRACT AND ORIGINAL BOARD OF TRUSTEES' CONTEMPORARY MINUTES CLEARLY STATING THE INTENT OF THE COLLEGE THAT THE SCHOLARSHIP ALLOWED HOLDERS TO SEND A STUDENT TO THE COLLEGE, IN PERPETUITY, `FREE OF TUITION'.
 ¶ 25. The Weekses concede that, while there is some Mississippi authority recognizing that actions of successors to the original parties to a contract may be considered in determining the intent of the original parties, it is, they argue, recognized, and common sense dictates, that such reliance is misplaced unless the evidence is somehow related to the original parties' intent. Citing, McBride Elec. Inc. v. Putt's Tuff, Inc., 685 P.2d 316
(Kan.App. 1984), the Weekses argue that, "The cardinal rule in interpretation of contracts *Page 1089 
is to determine the intent of the parties at the time the contract wasentered into, and to give effect to that intent." McBride,685 P.2d 316 at 320 (emphasis added).
 ¶ 26. Once again, the Weekses have sought shelter where none exists. The clear distinction between the case at bar and McBride
is that the court in the McBride case found that the contract was not ambiguous. That difference notwithstanding, the McBride court went further in that same holding to announce that, in addition to the "cardinal rule", there are two other rules for interpreting written contracts:
 The intent and purpose of a written instrument are not to be determined by considering one isolated sentence or provision thereof but by considering and construing the instrument in its entirety. In placing a construction on a written instrument, reasonable rather than unreasonable interpretations are favored by the law. Results which vitiate the purpose or reduce the terms of the contract to an absurdity should be avoided. The meaning of a contract should always be ascertained by a consideration of all the pertinent provisions and never be determined by critical analysis of a single or isolated provision. (citations omitted).
 ¶ 27. This Court holds, that taken in their entirety, the preceding rules of interpretation provide ample authority for the decision by the chancellor to examine the actions of the original contracting parties or their successors, to determine what they thought the agreement to be, and how they treated the subject matter.
 ¶ 28. The Weekses next cite Delta Wildlife F., Inc. v. Bear KelsoPlant, Inc., 281 So.2d 683 (Miss. 1973), and its holding that the contemporaneous construction placed upon the instrument by the parties thereto is entitled to a very great weight in reaching the intent and purpose of the instrument. On its authority, they urge this Court to consider the acts of the original parties, as evidence of the intent of the original parties, rather than the acts of subsequent parties. This Court finds that, in addition to the holding that the Weekses would have this Court adopt regarding the intent of the original parties, the Delta court gave equal validity to the "well settled" rule that where a contract is ambiguous, the court may look to the construction which the parties have placed upon it in order to ascertain its true meaning. That same court further held that what the parties to a contract consistently do thereunder is evidence of what the contract between them required that they should do. (citingGoldberg v. L. H. Realty Corp., 227 Miss. 345, 86 So.2d 326
(1956)).
 ¶ 29. The Weekses argue further, on the authority of City ofCincinatti v. Cincinatti Gas Light Co., 41 N.E. 239 (Ohio 1895), that the rule of practical construction ceases when the acts or conduct are not those of the parties who made the contract and who cannot be presumed to know, in their own minds, what was, in fact, meant by the words used. The distinction between the factual situation in the City of Cincinatti case and the case at bar is that the court in City of Cincinatti found that the course of dealing relied upon to establish a practical construction, was much more ambiguous than the contract itself and could furnish no safe guide for a construction different from the words themselves. That court, then, went on to hold that "To have any value as a practical construction, the course of dealing should be uniform, unquestioned, and fully concurred in by both parties." City ofCincinatti, 41 N.E. 239 at 241. This Court finds that each of those requirements was satisfied in the case at bar. From the first instance of its use, up to the complained of instance, the course of dealing between the heirs and assigns under the certificate and the College was uniform, unquestioned, and fully concurred in by both parties. The course of conduct consisted of either, tuition credit in the *Page 1090 
amount of $100 or the cost of one course per semester. We find, therefore, that the chancellor was correct in his holding, and we affirm his ruling.
II. DID THE CHANCELLOR ERR IN REFUSING TO AWARD DAMAGES TO DAVIDWEEKS AND SUSAN WEEKS RESULTING FROM THE COLLEGE'S REFUSAL TOHONOR THE SCHOLARSHIP?
 ¶ 30. On this issue, this Court simply reiterates the chancellor's findings. The scholarship certificate entitles Mr. Weeks, as the present possessor of the assignable scholarship certificate, to credit from the College for tuition for the greater of $100 or the cost of one course per semester, in perpetuity. All other claims for damages are without merit. The judgment is affirmed.
III. DOES THE SCHOLARSHIP CERTIFICATE VIOLATE THE RULE AGAINSTPERPETUITIES?
 ¶ 31. The rule against perpetuity is inapplicable to the fact situation of this case as it applies only to real and tangible personal property. Restatement of Property, § 401. Hence, we conclude the scholarship certificate does not violate the rule against perpetuities, and affirm the decision of the chancellor in this regard.
 ¶ 32. THE JUDGMENT OF THE CHANCERY COURT OF THE FIRST JUDICIALDISTRICT OF HINDS COUNTY, MISSISSIPPI IS AFFIRMED ON DIRECT ANDCROSS APPEALS. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THEAPPELLANTS.
McMILLIN, C.J., KING AND SOUTHWICK, P. JJ., BRIDGES, COLEMAN, DIAZ,LEE, AND THOMAS, JJ., CONCUR. PAYNE, J., NOT PARTICIPATING.