MITCHELL *v.* EAGLE MOTOR LINES, INC., et al.

No. 40018 May 21, 1956 87 So. 2d 466

*Hester & Gartin,* Laurel, for appellant.

*Beard, Pack & Ratcliff,* Laurel, for appellees.

ARRINGTON, J.

The appellant, Mrs. Dorthula Mitchell, the mother of Jerry Mitchell, deceased, filed this suit for herself and the heirs at law against Eagle Motor Lines, Inc., D. C. Hendon, Irvin R. Boatman, The Southland Company, and Doyle M. Nelson, to recover damages for the alleged wrongful death of Jerry Mitchell in a truck collision in which the appellees and others were involved. From an adverse judgment, she appeals as to the appellees, Eagle Motor Lines, D. C. Hendon, and Irvin R. Boatman.

Jerry Mitchell had obtained a ride in a tractor-trailer, which was loaded with sheet steel and being operated by Eagle Motor Lines in interstate commerce. The tractor-trailer was owned by Hendon and leased to Eagle Motor Lines, and was being driven by Boatman. At the conclusion of appellant's evidence, the court sustained a motion for a directed verdict for the Southland Company, Nelson and Hendon, and overruled the motions as to Eagle and Boatman, and submitted the cause to the jury, which resulted in a verdict for appellees.

The declaration charged that the appellees, Eagle and Hendon, owned and had under their joint control the truck involved in this accident; that the truck was improperly and negligently loaded and did not comply with the requirements of the interstate commerce commission

as to safety precautions; that the driver of the truck was under the joint control, supervision and direction of the appellees Eagle and Hendon; that Boatman negligently failed to keep a proper lookout for traffic ahead of him and negligently and carelessly failed to have said truck under reasonable control and drove said truck into the rear of Southland's truck, thereby causing the steel to shift forward, crushing the driver's compartment in which her son was riding as a passenger, and from which he received injuries that resulted in his death.

The answer of appellees denied the allegations of joint control, admitted Mitchell was killed as a result of the collision, denied all allegations of negligence as to improper loading and as to Boatman's driving. As to affirmative matter, they pleaded assumption of risk, and that Mitchell was a trespasser.

Jerry Mitchell, the deceased, was in the United States Army. He had finished his training in South Carolina and was being transferred to Ft. Sam Houston, Texas. He had spent several days with his family in Pell City, Alabama, a short distance from Birmingham. On September 14, 1954, he contacted one Mack Tucker, a neighbor and friend, who operated a truck for Eagle Motor Lines, Inc., and asked him to get him a ride to Texas. Tucker then contacted one Howell, also an operator for Eagle, who told him that he would give Mitchell a ride if it was all right with Hendon, the owner of the truck. Later he contacted Hendon, who said that it was all right with him if it was with his driver. Howell was dispatched that evening by Eagle with a load of freight for Dallas, Texas, and on the same evening, Boatman, an operator for Eagle, was dispatched by Eagle with a load of sheet steel to New Orleans.

Mitchell rode with Howell from Birmingham to Meridian, and on the way, Howell suggested that Mitchell should ride with Boatman to New Orleans, as Dallas would be 200 miles out of his way, and stated that he

would arrange with Boatman for him to ride. Howell and Boatman both stopped in Meridian and Mitchell transferred from Howell's truck to Boatman's truck, and Boatman proceeded on U. S. Highway 11 south from Meridian enroute to New Orleans. While traveling through Jones County, Mississippi, about daylight the next morning, he was following a Southland Oil Company truck being operated by Doyle M. Nelson. While proceeding uphill, a school bus about 100 yards ahead of Nelson had a blow-out, and Nelson immediately slowed down. At this time, Boatman was approximately 75 to 100 yards behind him. Boatman saw the Southland truck ahead of him and attempted to stop, but was unable to do so and crashed into the rear of the truck, which collision caused the cargo of steel to shift forward, crushing the driver's compartment, killing Mitchell and injuring Boatman. According to the testimony of Nelson, he had been traveling at a speed of approximately 40 to 45 miles per hour.

The appellant assigns as error that the court erred in granting the peremptory instruction for Hendon, because, she contends, (1) Hendon was the owner of the truck leased to Eagle and involved in the collision and that he was an independent contractor and that Boatman was his servant, and (2) that Hendon was responsible in causing a dangerous instrumentality to be operated on the highways. In view of appellant's statement that all parties to this appeal agree that the lease agreement is decisive on this point, we set out the pertinent parts of the agreement as follows:

"1. The owner does hereby rent, lease, and deliver to said Eagle Motor Lines, Inc., lessee, the following described motor vehicle upon the terms and conditions hereinafter set forth: . . . . . .

"2. The owner will properly qualify himself as operator or will furnish a properly qualified competent operator for said vehicle and operator shall be responsible for

the maintenance of daily logs and other records which might reasonably be required by lessee.

"3. The lessee is to have exclusive use and· control of said vehicle during the entire term of this lease agreement and said vehicle shall be used for the transportation of freight in both interstate and intrastate commerce under the authority of lessee. Lessee agrees, in order to insure a reasonable return to the owner as rent hereunder, to exercise reasonable efforts to put said vehicle to use in transporting freight under lessee's authority.

"4. Lessee agrees to pay the owner as rent for the use of said vehicle seventy-five (75%) percent of gross revenue derived and actually collected from the operation of said vehicle on outbound trips and seventy percent (70%) of gross revenue derived and actually collected from the operation of said vehicle on inbound trips, . . . . . . . . Payment to owner shall be made each Saturday for all trips completed on which clear delivery receipts and other required records have been turned in on or before the preceding Wednesday, and such payment shall be subject to set-off and deduction of any indebtedness or liability on the part of the owner to the lessee at that time.

"5. During the term of this lease the leased vehicle will at all times have permanently affixed to each side signs showing control by lessee. Vehicle will also have properly displayed thereon identification plates or tags as required by the various States into or through which the vehicle will be operated. The lessee will furnish such identification plates or tags and, as a pre-requisite to termination or cancellation of this lease, in addition to any other requirements stated elsewhere herein, the said permanent signs shall be completely removed from vehicle, and the identification plates or tags shall be turned in to lessee.

"6. It is understood that, as between owner and lessee, lessee is not obligated to carry or provide cargo or lia-

bility insurance affording indemnity or protection either to lessee or to the owner or operator for liability for personal injury, death and property damage arising out of the ownership, maintenance or use of the leased vehicle, but if lessee elects to carry any such insurance lessee will pay the premium therefor. Lessee will not be responsible for theft, fire or collision damage to the leased vehicle or for damage thereto from any cause whatsoever. The owner will be responsible to lessee for any claim arising from cargo loss or damage, whether or not caused by negligence of owner or operator, which is not covered by any cargo insurance policy which may be carried by lessee at that time. The owner agrees to indemnify lessee against all loss or damage occasioned by loss or damage to cargo and by lessee's liability therefor.

"7. During the entire term of this lease the owner will keep said vehicle in good, safe operating condition and repair at his own expense, and will pay all costs of operating and maintaining the same, including, without restricting the general meaning of the term 'all costs of operating and maintaining,' gasoline, oil, tires, parts, repairs, tarpaulins, operator's wages or compensation, taxes of every kind on operator's salary, State Vehicle Registration fees, fines for overweight or other illegal operation, bridge and highway tolls, loading and unloading labor or expense, and all ad valorem or other taxes on said vehicle or in connection with the operation or use thereof. If the owner fails to pay any cost or expense of operation or maintenance, lessee may make payment therefor, as may be necessary to keep leased vehicle in operation, and deduct all sums so expended from any amount due from lessee to the owner under the terms of this lease at any time. . . . . ..

"8. As between the owner and lessee, the operator and any helper or other employee engaged in the operation, servicing, repair or maintenance of the leased ve-

hicle is the agent or servant of the owner, and the owner agrees to pay a reasonable amount as a premium on a workmen's compensation or employer's liability policy which lessee may elect to carry for the protection of such employee, it being understood that lessee is under no obligation to provide such a policy, or if carrying such policy, to provide any protection to the owner himself under the policy. The owner agrees to indemnify lessee against all loss or damage sustained by lessee as a result of liability to third parties arising out of the operation, servicing, maintenance, ownership or use of the vehicle.

"9. In the event the owner or operator of said vehicle violates any rule or regulation of the Interstate Commerce Commission or any Federal, State or Municipal Law, rule or regulation, and as a result of such violation lessee is fined or incurs liability, owner will reimburse lessee for such fine and all expense in connection therewith. Owner will also reimburse lessee for any and all freight charges which the operator of said vehicle may collect and fail to remit to lessee.

"10. The owner agrees that the owner will not use, or permit owner's driver or other employee to use, the leased vehicle for any purpose other than the business of the lessee at any time during the period of this lease.

"11. Said vehicle is hereby pledged and conveyed by the owner to lessee to secure any indebtedness or liability whatsoever accruing now or any time hereafter during the term of this lease (whether arising out of any lease operation or not) on the part of the owner to the lessee, and also to secure the faithful performance by lessee of all the terms of this agreement, and lessee is vested with and shall have a lien upon said vehicle for such security.......

"12. Either party may terminate this agreement for any violation thereof by the other party, provided that no violation or termination therefor by either party shall

have the effect of discharging the pledge and lien held by lessee as above provided.

"13. . . . . . . .

"14. This lease agreement will expire December 31, 1954; provided that either party may terminate same prior to that time upon giving ten days written notice to the other party, and provided also that all other provisions herein have been complied with. . . . . . ."

■■ ■ The appellant contends that under the provisions of the lease, particularly paragraph 8, Hendon was an independent contractor and that Boatman was his servant, and not the servant of Eagle. In construing the provisions of a contract, the instrument as a whole will be looked to and its meaning determined from the entire agreement as written in order to ascertain the intention of the parties from the contract. Under the agreement, Eagle had exclusive use and control of the vehicle during the entire term of the agreement. Also the vehicle was to have signs displayed upon it showing control by Eagle. The agreement also provides that the owner should receive as rent for the use of the vehicle seventy-five percent (75%) of the gross revenue collected from the operation of said vehicle on outbound trips and seventy percent (70%) on inbound trips, and then provides that the owner of the vehicle shall pay all expenses for the maintenance, operation, etc., of the vehicle, and further provides that in settlement, the lessee is authorized to deduct these expenses, and, further, that the vehicle was pledged and conveyed by the owner to Eagle to secure any indebtedness or liability whatsoever.

■■■ The lease contract between Hendon and Eagle must be construed by considering all its parts and consistent with the purpose of the contract. It was designed to fix the rights as between Eagle and Hendon, not third parties. That intent and purpose is clearly shown. ■■■ Eagle had exclusive control of the opera-

tion of the truck so leased; directed all drivers operating trucks, whether owned or leased, as where to go and what to do with reference to picking up and delivering freight shipments; Hendon had nothing to do with its loading, dispatching, nor any other control over the actual operations of the truck. The driver of the truck had to meet Eagle's requirements. He had to qualify as a driver under the Interstate Commerce Commission's rules. Hendon was nothing more than the owner of a vehicle leased to and operated by and for Eagle.

In the case of Isaacs v. Prince and Wilds, 133 Miss. 195, 97 So. 558, the appellant Isaacs brought suit against the appellees for damages to an automobile in a collision with a truck owned by Prince and Wilds and rented to the Cumberland Telephone Company under an arrangement whereby the company would pay Prince and Wilds $10 per day for the truck, which price was to include compensation for the driver of the truck. The telephone company had control of the movements of the truck and driver, and the truck was engaged in the business of the telephone company at the time of the collision. The Court, in affirming the judgment, said: "It is clear to us from the principles announced in the foregoing cases that the truck was in the service of the Cumberland Telephone Company and that the driver was the servant of that company, performing their work, subject to their orders, and not subject to the orders of Prince & Wilds."

In the case of Express Co., Inc. v. Diggs, 174 Miss. 650, 165 So. 292, Diggs, the appellee, brought suit against the appellant Express Company and one C. C. Couvillon to recover damages for injuries received by him as the result of a collision between a motor freight truck driven by Couvillon and an automobile in which the appellee was traveling. The Express Company contended that the relation of master and servant did not exist between the Express Company and Couvillon; that Couvillon was an independent contractor for whose tort

the Express Company was not liable. The Court, in holding the Express Company liable, said:

"The Motor Express Company was a Louisiana corporation engaged in transporting and delivering, as a common carrier for hire, freight by motortrucks along certain highways, one of which was United States highway 90 from New Orleans to Mobile. The freight was accumulated by the shippers at a depot in the city of New Orleans and there loaded on trucks for various destinations. Couvillon owned a truck and trailer; he was under contract with the Motor Express Company and served the territory between New Orleans and Mobile, and was so engaged when the collision occurred, resulting in appellee's injury. The Motor Express Company issued waybills covering the freight in its own name, and directed Couvillon to deliver it to the consignees; the latter was charged by the company with the amount due on all C.O.D. packages, for which he in turn accounted to the company. He was authorized to accept freight for the Motor Express Company anywhere along the route, deliver it to the consignees, and collect regular freight charges thereon, fixed by the company. Couvillon's compensation was a certain per cent of all freight charges received. The Motor Express Company had freight agents at Biloxi and Pascagoula, in this state, whose duty it was to receive and distribute freight on its account. In many respects the Motor Express Company had substantial control over the means and methods used by Couvillon in carrying freight for it. He was therefore a servant and not an independent contractor. Texas Co. v. Mills, 171 Miss. 231, 156 So. 866; Gulf Refining Co. v. Nations, 167 Miss. 315, 145 So. 327; McDonald v. Hall-Neely Lumber Company., 165 Miss. 143, 147 So. 315. An independent contractor is one rendering services in the course of his occupation representing the will of his employer as to the results alone, and not as to the means of accomplishing those results."

Appellant contends that Hendon was liable in causing a dangerous instrumentality to be operated on the public highways in that the evidence shows that he did not comply with Interstate Commerce Commission safety regulations, Section 193.85, as follows:

"Protection against shifting cargo. Every motor vehicle carrying cargo such as beams, pipes, sheet steel, and heavy rolls, the nature of which is such that the shifting thereof due to rapid deceleration or accident would be likely to result in penetration or crushing of the driver's compartment must, in addition to having the load security fastened or braced, be provided with header boards or similar devices of sufficient strength to prevent such shifting and penetration. All motor vehicles shall be so' constructed or be equipped with adequate cargo fastening devices so that the load will not penetrate the cargo compartment wall when subjected to the maximum braking deceleration of which the vehicle is capable."

Appellant argues that paragraph 7 of the lease made it Hendon's duty to "keep said vehicle in good, safe operating condition and repair at his own expense. . ." This provision has no application to loading. This was Eagle's responsibility. The truck itself was not a dangerour instrumentality. Vicksburg Gas Company v. Ferguson, 140 Miss. 543, 106 So. 258; Primos v. Gulfport Laundry & Cleaning Co., 157 Miss. 770, 128 So. 507. We are of the opinion that the court correctly sustained the requested peremptory as to Hendon.

The lower court instructed the jury for Eagle that deceased was a trespasser and that Eagle owed him no duty except not to wilfully and wantonly injury him. Appellant assigns this as error.

The evidence is undisputed that Eagle did not give permission for the deceased to ride in the truck driven by Boatman, and that deceased was riding in the truck at the time of his death in violation of the rules of Eagle as to the operation of its trucks. Interstate Commerce Commision Safety Regulations, Rule 192.60, is as follows:

"Unauthorized persons not to be transported. Unless specifically authorized in writing to do so by the motor carrier under whose authority the motor vehicle is being operated, no driver shall transport any person or permit any person to be transported on any motor vehicle other than a bus. When such authorization is issued, it shall state the name of the person to be transported, the points where the transportation is to begin and end, and the date upon which such authority expires. . . . "

We hold that the deceased was a trespasser and the lower court properly instructed the jury to that effect. Y. & M. V. RR. Co. v. Tatum, 174 Miss. 82, 163 So. 893; Southern United Ice Company v. Fowler, 185 Miss. 300, 187 So. 218; Watson v. Holiman, 169 Miss. 585, 153 So. 669; Thomas v. Hively, 196 Miss. 187, 16 So. 2d 632.

■■■ The court fully and properly instructed the jury on all issues involving the question whether Eagle or its servant willfully or wantonly injured the deceased, resulting in his death, and on the issue of simple negligence as to Boatman, and these issues were resolved by the jury against the appellant.

■■■ The lower court erred in refusing appellant a requested instruction that would have authorized the jury to take into consideration, in fixing the amount of damages, the present net cash value of the life of the deceased at the time of his death, but this error was harmless since the jury found for the appellees. Campbell v. Willard, 205 Miss. 783, 39 So. 2d 483; American Creosote Works, Inc. v. Rose Brothers, Inc., 211 Miss. 173, 51 So. 2d 220.

A review of the whole record and a careful examination of all contentions made by appellant indicates no reversible error, and it follows that the judgment of the court below is affirmed.

Affirmed.

All Justices concur, except Kyle and Gillespie, JJ., who did not participate.