518 So.2d 1194 (1988)
MAGNOLIA CONSTRUCTION CO., INC., a Corporation
v.
MISSISSIPPI GULF SOUTH ENGINEERS, INC., A Corporation.
CITY OF HATTIESBURG
v.
TRAVELERS INDEMNITY COMPANY.
No. 57324.
Supreme Court of Mississippi.
January 6, 1988.
*1195 H.A. Moore, III, Samuel J. Duncan, More, Jones & Fowler, Hattiesburg, for appellant.
S. Wayne Easterling, Easterling & Varnado, P. Richard Lambert, D. Gary Sutherland, Joseph A. O'Connell, Heidelberg, Sutherland & McKenzie, Hattiesburg, Richard F. Yarborough, Jr., Aultman, Tyner, McNeese & Ruffin, Columbia, for appellees.
Before DAN M. LEE, P.J., and SULLIVAN and ANDERSON, JJ.
DAN M. LEE, Presiding Justice, for the Court:
On October 21, 1982, Magnolia Construction Co., Inc. (hereinafter "Magnolia"), a Louisiana corporation, filed a complaint *1196 against Mississippi Gulf South Engineers, Inc. (hereinafter "Gulf South") and the City of Hattiesburg in the Circuit Court of Forrest County. Magnolia sought to recover $350,000 which it spent correcting construction work it had done on a sewer project for the City of Hattiesburg. Magnolia alleged that Gulf South, engineer for the project, was liable to Magnolia for the losses, claiming that Gulf South damaged Magnolia by negligently preparing the plans and specifications, negligently supervising the construction, negligently employing an untrained or inadequately trained resident inspector, negligently inspecting the construction and negligently approving the construction when it knew or should have known that Magnolia was relying on the engineers to see to it that the project progressed according to specifications. Magnolia claims that Gulf South breached its duty of due care owed to the plaintiff and as a direct and proximate result of the negligent acts of the engineers, Magnolia suffered damages. Magnolia's claim against the City of Hattiesburg resulted from the City retaining $84,000 of the contract funds which Magnolia claims should have been disbursed. Gulf South answered, denying that it was liable for any of Magnolia's losses, and also interposed a counterclaim against Magnolia as well as a cross-claim against the City of Hattiesburg for the payment of $47,000 for engineering fees and expenses for the defective work's removal and replacement. In its response to Magnolia's suit, the City interpled the retainage funds and deposited them in the court's registry, and in addition, filed a counterclaim against Magnolia and a cross-claim against Gulf South in order to assert an indemnity claim against each of them. Gulf South also filed a motion to join Travelers Indemnity Company (hereinafter "Travelers"), Magnolia's surety, as a counter-defendant in its counterclaim against Magnolia. This motion was granted. Upon completion of extensive discovery, Gulf South filed a motion for summary judgment in which it sought dismissal of all the claims asserted against it by Magnolia. The City of Hattiesburg filed a separate motion for summary judgment against Magnolia, seeking the same relief as well as filing a motion for summary judgment on its indemnity cross-claim against Gulf South. On April 24, 1986, the trial court entered its order granting these three summary judgment motions. In its order the trial court also dismissed Magnolia's suit against the City, since it found that the City's alleged liability was predicated upon Magnolia being able to establish its claim against Gulf. The trial court granted the City a summary judgment on its cross-claim for indemnity from Gulf South, even though the claim for which the City was seeking indemnity had already been dismissed. Magnolia appeals the entry of that order, assigning nine errors:
I. THE CIRCUIT COURT ERRED IN GRANTING SUMMARY JUDGMENTS IN FAVOR OF THE APPELLEES FOR THE REASON THAT GENUINE ISSUES OF MATERIAL FACT EXIST.
II. THE CIRCUIT COURT ERRED IN GRANTING SUMMARY JUDGMENTS IN FAVOR OF THE APPELLEES FOR THE REASON THAT APPELLEES FAILED TO MEET THEIR BURDEN OF DEMONSTRATING THAT NO GENUINE ISSUES OF MATERIAL FACT EXIST.
III. THE CIRCUIT COURT ERRED IN GRANTING SUMMARY JUDGMENTS IN FAVOR OF THE APPELLEES FOR THE REASON THAT THE CIRCUIT COURT TRIED ISSUES OF FACT IN REACHING ITS DECISION TO GRANT SUMMARY JUDGMENTS.
IV. THE CIRCUIT COURT ERRED IN GRANTING SUMMARY JUDGMENTS IN FAVOR OF THE APPELLEES FOR THE REASON THAT THE COURT IMPROPERLY RESOLVED AMBIGUOUS CONTRACT TERMS.
V. THE CIRCUIT COURT ERRED IN GRANTING SUMMARY JUDGMENTS IN FAVOR OF THE APPELLEES FOR THE REASON THAT THEY WERE NOT ENTITLED *1197 TO SUMMARY JUDGMENT AS A MATTER OF LAW.
VI. THE CIRCUIT COURT ERRED IN GRANTING SUMMARY JUDGMENTS IN FAVOR OF THE APPELLEES FOR THE REASON THAT APPELLANT'S CONSTITUTIONAL RIGHT TO TRIAL BY JURY WAS ABRIDGED.
VII. THE CIRCUIT COURT ERRED IN GRANTING SUMMARY JUDGMENTS IN FAVOR OF THE APPELLEES FOR THE REASON THAT IT WAS MANIFEST ERROR.
VIII. THE CIRCUIT COURT ERRED IN GRANTING SUMMARY JUDGMENTS IN FAVOR OF THE APPELLEES FOR THE REASON THAT APPELLANT IS SUBROGATED TO THE RIGHTS OF THE CITY AGAINST GULF SOUTH ENGINEERS, INC.
IX. THE CIRCUIT COURT ERRED IN GRANTING GULF SOUTH'S MOTION IN LIMINE REGARDING THE E.P.A. INSPECTION GUIDE AND THE G.A.O. REPORT ON RESIDENT INSPECTORS.

FACTS
In the mid-1970's the City of Hattiesburg, Mississippi, began taking measures to rehabilitate its sewage collection and treatment facilities. One of the City's first acts was to enter into an engineering agreement with Gulf South Engineers. Under the terms of that agreement, Gulf South provided engineering and administrative services needed to obtain certain EPA grants which were then available to cover a portion of the cost of the sewer rehabilitation work. After the EPA grant was obtained, Gulf South acted as the City's consulting engineer for that project. In doing so, Gulf South prepared the EPA-approved contract documents which were viewed by various contractors in bidding on the sewer rehabilitation construction project. Magnolia, as the successful low bidder, entered into a construction contract with the City of Hattiesburg to perform the rehabilitation work covered by the grant. The construction work extended from 1978 through 1980.
During the construction, Gulf South furnished an on-site resident field representative. As construction began, Magnolia's crew dug up old sewer pipe and replaced it with new pipe. Shortly after the work began, Gulf South replaced the original resident field representative with another who worked for approximately two weeks. About a month after construction began, Gulf South again changed resident field representatives. Periodically Magnolia sought payment for work performed to date by completing a Periodic Estimate for Partial Payment form which was required by the contract documents. These forms were submitted to Gulf South for approval prior to being presented to the City. The Partial Payment Request forms contain a certificate by the resident field representative and the field engineer concerning the inspections made and the quality of work performed by the contractor. During the course of construction 18 such Partial Payment Requests were submitted and approved by Gulf South and Magnolia received these payments. In 1980, after two years of work, the sewer project was finished and Magnolia applied for its final payment. The final payment request was not approved and still has not been paid. Gulf South denied final payment because it determined some of the grades were not in accordance with the original plans. Gulf South required Magnolia to rework some sections of the sewer at a cost to it of $350,000. No one disputes the fact that certain pipes were laid off-grade and off-line according to the original plans. The factual question in this case is why the grades were off.
Magnolia claims that the reason the lines were laid off-grade is because Gulf South, as the engineering consultant on this project, negligently prepared the plans and specifications, and then negligently supervised the construction because it employed an untrained or inadequately trained resident inspector. Furthermore, Magnolia alleges that by approving the construction in *1198 order for Magnolia to receive its periodic payments, the engineering company should have known that Magnolia was reasonably relying on the engineers to perform the functions of planning, design, supervision, inspection and approval of payment requests with due care and that the engineers knew or should have known that Magnolia was relying upon the approval of the engineers as it completed each segment of the project and turned the project over to the City to be put into immediate use. Finally, Magnolia alleges that the engineers knew or should have known that their failure to exercise ordinary and due care in the performance of their obligations with regard to the construction project would result in substantial damage to Magnolia. Because the engineers breached their duty of care owed to the Plaintiff, and as a direct and proximate result of those negligent acts, Magnolia has suffered damage.
Gulf South, on the other hand, denies that it had any contractual duty to Magnolia because its contract agreement was with the City of Hattiesburg. Gulf South further argues that it assumed no inspection duties toward Magnolia on the job site. It claims that its inspection duties were limited to one final inspection of the project when it was completed, which it carried out. Finally, Gulf South argues that even if Gulf South were negligent in its inspection duties, Magnolia could not maintain this suit against them because Gulf South and Magnolia would be in the position of joint tortfeasors and Magnolia cannot maintain a suit in indemnity against a joint tortfeasor.

THE LAW
Magnolia's first eight assignments of error deal with the same contention: that the trial court erred in granting summary judgment in favor of Gulf South because there are genuine issues of material fact in dispute and because Gulf South is not, as a matter of law, entitled to a summary judgment. The lower court granted summary judgment on the basis of two findings. First, it found that Magnolia and Gulf South were joint tortfeasors and, therefore, Magnolia cannot maintain an indemnity action against Gulf South. Second, it found that Gulf South owed no contractual duty to Magnolia, nor did it assume a duty on the job site to Magnolia to inspect Magnolia's work on a day-to-day basis. As to Gulf South's legal duty of professional care, the lower court found that such duty is defined by its contractual obligations to the City of Hattiesburg. In other words, Magnolia could reasonably rely on Gulf South to inspect its work only insofar as Gulf South was obligated to inspect in its contractual agreement with the City of Hattiesburg. The court found that Gulf South had no duty to inspect except when the project was completed, according to its contract with the City. We will first focus on the law on summary judgment; second, we will consider the law on joint tortfeasors in common law indemnity actions; third, we will focus on the professional duty the project engineer owes to third parties outside its contractual relationship with the owner of a project, specifically to contractors on the same project.

I.

Summary Judgment
The seminal case in Mississippi on M.R.C.P. 56, Summary Judgment, is Brown v. Credit Center, Inc., 444 So.2d 358 (Miss. 1983). In that case, this Court first pointed out the advisory committee's comments which state that
A motion for summary judgment lies only when there is no genuine issue of material fact; summary judgment is not a substitute for the trial of disputed fact issues. Accordingly, the Court cannot try issues of fact on a Rule 56 motion; it may only determine whether there are issues to be tried.
Id. at 362. Next, this Court outlined the procedure the trial courts must follow for granting a motion for summary judgment. They must "review carefully all of the evidentiary matters before it  admissions and pleadings, answers to interrogatories, depositions, affidavits, etc." and the evidence must be viewed "in the light most favorable *1199 to the party against whom the motion has been made." Id. Only if the moving party is entitled to summary judgment as a matter of law should one be entered. Finally, the Court cautioned the trial courts that if there is any doubt as to whether there is a genuine issue of material fact, the trial court should err on the side of denying a motion for summary judgment. Id. at 363. See also, Comments to Rule 56. Specifically applying summary judgment to a contract dispute, this Court stated in Dennis v. Searle, 457 So.2d 941 (Miss. 1984), that "where the contract is ambiguous and its meaning uncertain, questions of fact are presented which are to be resolved by the trier of the facts after plenary trial on the merits" and that "[t]he interpretation of an unclear contract generally involves questions of fact sufficient so that our summary judgment procedure will be an inappropriate vehicle for final decision." Id. at 945. In a more recent pronouncement, this Court reiterated these principles as follows: "All motions for summary judgment should be viewed with great skepticism and if the trial court is to err, it is better to err on the side of denying the motion." Ratliff v. Ratliff, 500 So.2d 981 (Miss. 1986). The Court went on to say that "[w]henever a doubt exists whether there is a fact issue, the non-moving party gets its benefit. Indeed, the party against whom the summary judgment is sought should be given the benefit of every reasonable doubt." Id. at 981. This Court has repeatedly applied these principles in its consideration of summary judgments on appeal. See e.g., Gray v. Baker, 485 So.2d 306 (Miss. 1986); Shaw v. Burchfield, 481 So.2d 247 (Miss. 1985); Willis v. Mississippi Farm Bureau Mutual Insurance Company, 481 So.2d 256 (Miss. 1985); Pearl River City Board v. South East Collections Agency, Inc., 459 So.2d 783 (Miss. 1984); Biggers v. Fox, 456 So.2d 761 (Miss. 1984); Dethlefs v. Beau Maison Development Corporation, 458 So.2d 714 (Miss. 1984). With these principles in mind, we now turn to the findings made by the trial court upon which it granted Gulf South's motion for summary judgment.

II.

Joint Tortfeasors and Common Law Indemnity Actions
The lower court, in granting summary judgment for Gulf South, found that Magnolia was negligent in its obligations to lay the sewer pipes properly. The lower court then assumed that Gulf South was also negligent in its duties to inspect and, therefore, Gulf South and Magnolia were joint tortfeasors. Such a theory of joint tortfeasors is misapplied to this set of facts. In the first place, Magnolia never admitted in its pleadings, answers, interrogatory answers, depositions or affidavits that it had performed its contractual duty negligently. All Magnolia admitted was that a section of pipe was laid off-grade. In fact, Magnolia produced much evidence through discovery that it performed its contractual obligations properly.
The deposition of the foreman of the construction crew for Magnolia indicates that he and his crew continuously shot elevations on the grade and line while pipes were being installed. He stated that his cutsheet elevations indicate substantial compliance with the specifications for the job. He also stated that he had no explanation as to why there was a difference between the cutsheet elevations and the as-built plans. He continued that if those elevations were off, the tie-ins to the other pipes would have been off and the system would not work. He stated that when he left, the pipes had been in use in some places for over a year and that they were all properly working. He also claims that when specific problems arose at the job site, the engineers were notified by him and the engineers made the decision to make any changes in the original plans.
The deposition of the project engineer for Gulf South also indicates that during the progress of the job, he did not perceive that Magnolia was doing its job negligently. In fact, in one instance he stated that he would not have signed the Periodic Pay Request if he had known that the work was not up to par. The engineer also stated that he left the project when about 90% of the work was completed, and that before *1200 he left, he had never ordered any work to be redone by Magnolia.
The deposition of the engineer's assistant for Gulf South also indicates that during the progress of the project, he checked invert elevations regularly and found that they were usually satisfactory. He further testified that if he checked the elevation and there was something wrong, he reported it to the contractor immediately. His field notes indicate that he checked other elevations himself with his own equipment and determined on various occasions that the contractor was laying the pipe to grade. Apparently, the foreman for Magnolia knew of several occasions that he had incorrect elevations and asked the engineer's assistant to check it for him. The assistant was only available on the job throughout the first five to ten percent of it.
The deposition of the Gulf South's field representative who worked throughout the remainder of the project indicates that the foreman for Magnolia diligently checked his own grade elevations. He stated that the foreman probably shot more grade elevations than he did, probably "one thousand to one." He also stated that the foreman rechecked his grades every morning with the laser beam before he began laying pipe.
In summary, Magnolia produced evidence that it had adequately performed its obligations under its contract to the City. On the contrary, Magnolia alleges that the pipe was laid off-grade due to Gulf South's negligence.
Gulf South produced evidence that Magnolia performed negligently, causing the pipe to be laid off-grade. The deposition of its expert witness indicates that the responsibility to check for correct line and grade was clearly assigned to the contractor in the Project Manual. In his opinion, the reason the Hattiesburg project was laid off-grade was because the contractor failed to institute a quality control program of its own. It was also his opinion that it was a matter of engineering judgment whether or not a particular project required day-to-day, periodic, or only final inspection under the contract documents. The engineer's only responsibility to the City under this Project Manual was to deliver a completed correct project, which he claims it eventually did. Gulf South, then, produced evidence that it performed its contractual obligations adequately and that Magnolia perhaps did not.
At the outset, whether or not Magnolia performed negligently is a genuine issue of material fact much in dispute. In order for the trial judge to find that Magnolia was negligent, he had to decide this issue himself. This issue, however, is one that must be decided by the trier of fact at a trial on the merits, and the trial judge erred when he decided this issue under M.R.C.P. 56.
Next, the trial judge determined that since both Magnolia and Gulf South were negligent, they were joint tortfeasors and that Magnolia cannot maintain an indemnity action against Gulf South. In order to be joint tortfeasors, Magnolia and Gulf South would either have to have acted in concert to cause damage to the City; would have to be able to be joined as co-defendants; one would have to be vicariously liable to the other; or both would have to have negligently carried out a common duty owed to the City. See Prosser and Keeton on the Law of Torts, §§ 46-47 (W. Page Keeton, 5th Ed. 1984). None of these categories applies to Magnolia and Gulf South because each fulfilled its contractual obligation to the City and neither of them is being sued by the City. Indeed, the City has suffered no loss. Magnolia repaired the defective work, sustaining a $350,000 loss in the process. The City, having suffered no damage, could not sue either Magnolia or Gulf South in tort. Therefore, Magnolia and Gulf South cannot be joint tortfeasors who are liable to the City.
The case does not turn on what duty Magnolia and Gulf South owed to the City. Rather, it turns on what duty Gulf South, as a design professional, owed to the contractor and whether Gulf South breached that duty. Since Mississippi is a comparative negligence state, see Miss. Code Ann. § 11-7-15 (1972 & Cumm.Supp. 1987), Gulf South may allege Magnolia's negligence as a defense and the trier of fact can assign fault proportionately. The trial judge *1201 erred in granting summary judgment based on a theory of joint tortfeasors and common law indemnity.

III.

The Duty of a Project Design Professional To the Project 
Contractor
With respect to the negligence claim in this case, the question of law facing the trial court, and the question ultimately facing this Court, is what legal duty Gulf South, the project design professional, owed Magnolia, the project contractor. The trial court correctly concluded that since there was no contract between Magnolia and Gulf South, Gulf South owed no contractual duty to Magnolia.
Next, the trial court considered whether or not Gulf South assumed any duty to Magnolia by its conduct on the job or in the City's respective contracts with either Magnolia or Gulf. It concluded that Gulf South did not assume any duties to supervise or inspect by its conduct on the job on which Magnolia could rely. The trial judge points to the deposition of Magnolia's foreman as evidence to support his finding. The record does not reflect conclusively, however, that the foreman or Magnolia did not rely on Gulf South's supervision and inspection. While the foreman acknowledged that laying the pipe according to grade was the responsibility of the contractor, he perceived that it was the engineer's field inspector's duty to inspect and certify the work as it progressed. In his own words, "Engineers are getting paid by the City to do that [inspect]. If all we had to do is go by the specs [specifications] we wouldn't need to hire an engineering firm. The engineers might as well stay home." He also stated that Gulf South's field representative did check the pipe a couple of times a day, and when specific problems arose, the engineers were notified and they made the decisions to change the plans.
These statements are corroborated by the affidavits of the president of Magnolia and a machine operator for Magnolia's crew. The president stated that at a preconstruction conference, Gulf South assured him that a resident field inspector would inspect and approve work as construction progressed because live sewage would be tied into the sewer lines as they were constructed. He further stated that before each major tie-in, his foreman informed him that approval of the work was obtained from the resident inspector.
The machine operator stated that Gulf South's field representative acted in the capacity of an inspector on the job site, both supervising the crew when the foreman was at the other job site, and by authorizing deviations from the original plans between reference points [manholes].
Gulf South's own engineering assistant stated that he conducted on-site inspections and that when he shot his own elevations he immediately reported any problems to the contractor. He further stated that he checked behind the contractor to see if they were progressing as they should.
The final inspector on the job stated that he did not perceive that his job was to tell the foreman whether or not his grade elevations conformed or not. Yet, he did check them at random and if there was a problem, he told the engineer, not the contractor, and the engineer sometimes relayed instructions through him to the contractor.
Gulf South's project engineer explained in his deposition that during the course of construction, the engineer decides whether or not a change order should be entered depending on whether a change during construction adds to the final cost of the project. If no monetary change is involved, it becomes a verbal agreement between the engineer and the contractor, based on field conditions, as to whether or not a change should be made. For that reason, it seems that the field representative was to be on-site at all times the contractor worked. He further stated that he had no problems with Magnolia not doing the project according to the specifications. In his statements about the Periodic Pay Estimates, however, the project engineer claimed that the engineer did not make any *1202 inspection of the line prior to turning in the Periodic Pay Request. He also said that the field representative did not make any inspection because these payments were based on the quantity of work and not the quality. However, he admitted that the certificate attached to the Pay Request says "work and materials have been inspected and comply with the standards of the contract." The certificate was signed by the field engineer and eventually signed by him. He did not interpret the certificate as meaning quality inspection, just quantity inspection. However, he then stated, "I would not have signed it if I knew the work wasn't up to par, that's for sure."
Obviously, there is much dispute as to whether or not Magnolia could reasonably rely upon Gulf South to inspect its work on a consistent basis because of the conduct of the engineer and the engineer's field representative on the job site. This dispute involves factual situations which should not have been decided by the trial court in granting summary judgment under M.R.C.P. 56. These factual determinations should be determined by the trier of fact at a trial on the merits.
The trial judge in granting summary judgment next considered what common law duty Gulf South may have owed Magnolia. He determined that where the engineer does not have a direct contractual relationship with the contractor, the legal duty which forms the basis of the contractor's negligence claim still must arise from a contract-based obligation of the engineer to the City. Indeed, Mississippi law imposes on design professionals (architects/engineers) the duty to "exercise ordinary professional skill and diligence." Board of Trustees Utica Junior College v. Lee Electric Co., 198 So.2d 231, 234 (Miss. 1967); Dickerson Construction Co., Inc. v. Process Engineering Co., Inc., 341 So.2d 646, 652 (Miss. 1977). Further, Mississippi law allows third parties to rely on a design professional's contractual obligation to the owner. In Mayor and City Council, etc. v. Clark-Dietz, Inc., 550 F. Supp. 610 (N.D. Miss. 1982), the Federal District Court, relying on Mississippi law, stated:
"Because of this contractual obligation to the owner, the architect owes a further duty, sounding in tort, to the contractor who relies upon the design to his economic detriment." Id. at 624. See Owen v. Dodd, 431 F. Supp. 1239 (N.D.Miss. 1977); Engle Acoustic Tile, Inc. v. Grenfell, 223 So.2d 613 (Miss. 1969); State v. Malvaney, 221 Miss. 190, 72 So.2d 424 (1954); Standard Construction Co. v. Brantley Granite Co., 90 Miss. 16, 43 So. 300 (1907). Mississippi law also recognizes an engineer's duty to inspect the contractor's work. City of Mound Bayou v. Roy Collins Construction, 499 So.2d 1354, 1359 (Miss. 1986); Newton Investment Co., Inc. v. Barnard & Burk, Inc., 220 So.2d 822, 824 (Miss. 1969). Prosser states the general principle, thus:
By entering into a contract with A, the defendant may place himself in such a relation to B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured.
Prosser and Keeton on Torts, § 93 (W. Page Keeton, 5th Ed. 1984). Other jurisdictions have similarly held that a design professional owes a common law duty of due care to the general contractor, sub-contractor, or contractor's surety in the performance of his contract with the owner. See, e.g., Davidson and Jones v. County of New Hanover, 41 N.C. App. 661, 255 S.E.2d 580 (1979); Vonasek v. Hirsch and Stevens, Inc., 65 Wis.2d 1, 221 N.W.2d 815 (1974); Chastain v. Atlanta Gas Light Company, 122 Ga. App. 90, 176 S.E.2d 487 (1970); Quail Hollow East v. Donald J. Scholz Company, 47 N.C. App. 518, 268 S.E.2d 12 (1980); Lee County v. Southern Water Contractors, 298 So.2d 518 (Fla. App. 1974); American Fidelity Fire Insurance v. Pavia-Byrne Engineering, 393 So.2d 830 (La. App. 1981); A.R. Moyer, Inc. v. Graham, 285 So.2d 397 (Fla. 1973).
Applying this principle of law to this case, the trial judge determined that under Gulf South's contract with the City, it had no contract-based obligation to check each invert elevation. He cites several contract provisions in support of his finding which *1203 indicate that the project engineer had the duty to inspect only periodically and that the field representative and engineer's approval of pay requests only certified that "to the best of their information and belief the work was progressing according to plan." However, another aspect of the contract documents needs to be considered.
In his deposition Magnolia's expert witness explained that the EPA Grant Condition documents had to be read as part of the entire package of contract documents in order to properly interpret the engineer's duties to the City. In order to get the 75% grant from EPA, the engineer and City must agree to special conditions of the grant offer. In that document, there is a clause requiring a full-time resident inspector. In his opinion, "I don't think you can write yourself out" of an EPA requirement by not putting it into the Project Manual. He also pointed out that this engineer's contract is unusual in that the engineer is undertaking, for a 15% override, additional duties that normally a City's Public Works Project Director would undertake to make sure that everything is in compliance with the Grant Conditions imposed on the City. He summarized that there are conflicts in what he considers to be the totality of the contract documents. Considering all of these documents, he offered the opinion that although the engineers are not responsible for the supervision of the construction crew, nor for the type of equipment it utilized to perform the contract, nevertheless, each 30 days the engineer should make enough checks on his own under his responsibilities to verify to his client that the contractor has laid the pipe according to the specifications and that his figures are correct for payment. He also stated that there is a difference between the contractor's liability for correcting defective work as it is caught by the engineer as the work progresses and his liability after the engineer has approved the work and then requires the contractor to go back and redo the defective work that should have been caught during construction, especially here where the lines had to go into use before final inspection. In conclusion, he stated that the supervision responsibilities of Gulf South were improperly performed under these contract documents.
Gulf South has adamantly denied throughout the proceedings in the lower court that the EPA documents are part of its contract agreement with the City. Therefore, Gulf South's expert witness did not rely on the EPA Grant Conditions to form his expert opinion. His deposition, nevertheless, points out some conflicts in interpretation of what Gulf South deems to be the contract documents. He stated that, under these documents, it is a matter of engineering judgment whether or not a particular project requires day-to-day, periodic, or only final inspection. However, in the literal interpretation of these contract documents, he found that the engineer had no responsibility to the contractor to inspect during the progress of the work because this duty was clearly assigned to the contractor. He also makes a distinction between a field representative's duties and a field inspector's duties. A field inspector has the added duty to perform his own inspections on top of his responsibilities as a field representative.
The dispute seems to boil down to whether Gulf South provided a field representative or a field inspector for this project. The contract documents speak of a field representative; yet, Gulf South submitted bills to the City for a resident inspector totalling $75,000. Gulf South's expert even conceded that in this case a representative and inspector may mean the same thing. In the Pay Request Certificates, the words "inspect" and "inspector" appear. Gulf South's expert stated that if the pay certificate says the engineer inspected, he would have no reason to doubt that, indeed, the work was inspected. Both Magnolia's and Gulf South's experts agree that the contractor cannot get paid unless the engineer signs the Periodic Payment.
It seems, then, that there is much factual dispute between these two parties as to Gulf South's obligations in performing job site inspections. The trial judge was correct in trying to determine the intent of the parties to the contract from the four corners of the document. Early on, this Court *1204 stated the principle that "in construing a contract, the instrument as a whole will be looked to and its meaning determined for the entire agreement as written in order to ascertain the intentions of the parties from the contract." Mitchell v. Eagle Motor Lines, 228 Miss. 214, 87 So.2d 466, 469 (1956). See also, Pfisterer v. Noble, 320 So.2d 383, 384 (Miss. 1975) ("in construing a written instrument, the task of the courts is to ascertain the intent of the parties from the four corners"); Robinson v. Martel Enterprises, Inc., 337 So.2d 698, 701 (Miss. 1976) ("[T]he Court will look only to the four corners of the instrument to ascertain and give effect to the intention of the parties").
However, in this case it is not clear exactly what documents Gulf South and the City included in their contractual agreement; it is equally unclear in the record exactly what documents the trial judge relied on when he found that Gulf South had no contract-based obligation to check invert elevations. There is also much conflict in the evidence as to whether Gulf South was obligated to supply a field representative or a field inspector for this project, and exactly what duties this field representative should have undertaken or, indeed, did undertake at the job site. Because this contract is ambiguous and its meaning uncertain, there are "questions of fact presented which are to be resolved by the trier of facts after plenary trial on the merits" and "[t]he interpretation of an unclear contract generally involves questions of fact sufficient so that our summary judgment procedure will be an inappropriate vehicle for final decision." Dennis v. Searle, 457 So.2d 941, 945 (Miss. 1984). Therefore, the court was clearly in error in granting summary judgment.
Because we find that summary judgment was an inappropriate vehicle for final decision in this case, and that the court was clearly in error in granting summary judgment, we reverse.
It should also be noted that Magnolia, in its pleadings, claimed that Gulf South negligently designed and planned this project. The trial judge made no findings on this issue when he granted Gulf South's motion for summary judgment. There is conflicting evidence on this issue as well. Magnolia's expert stated that one of the reasons he thought the pipe was laid off-grade was because the plans were designed on a minimum grade  the very minimum grade that would allow flow at the proper velocity. Gulf South's engineer stated in his deposition that during the course of construction, the data for the designs turned out to be correct. He and Gulf South's engineering assistant were involved in the original planning of the design and specifications for this project. This seems to be a key issue in the case, and would require findings of fact to be made at a trial on the merits.

IV.

The Circuit Court Erred in Granting Gulf South's Motion In Limine Regarding The EPA Construction and Inspection Guide And the GAO Report of Resident Inspectors
Magnolia's final assignment of error deals with two motions in limine filed by Gulf South to suppress the EPA Grant Condition documents and the General Accounting Office recommendations about job site supervision of Corps of Engineers projects, and any references thereto. The record is not clear as to the trial court's disposition of these motions. No order granting or denying Gulf South's motions appears in the record. However, in the order granting summary judgment, the trial judge overruled all other motions as being moot. That being the case, this assignment of error is not preserved for appeal.
As a matter of consideration, however, it appears that the EPA Grant Conditions would be relevant under Mississippi Rules of Evidence 401, 402 and 403 in determining the entirety of Gulf South's contractual obligations to the City. The deposition of Magnolia's expert is persuasive evidence that Gulf South had a duty to protect the City's eligibility to receive 75% Federal funding for the project. Those documents reflect that the City had an obligation to provide full-time inspection of *1205 the project. The City contracted with Gulf South to fulfill the City's obligations to the EPA. Therefore, if Gulf South's professional duty of care to Magnolia is defined by Gulf South's contractual obligations to the City, then all documents which comprise the agreement between Gulf South and the City would appear to be relevant to the issue of Gulf South's professional duty to Magnolia.
As to the GAO report, Magnolia claims in its brief in opposition to the motion in limine that its expert relied on this and other sources to form the basis of his opinion. Under M.R.E. 703 and comments thereto, such evidence, if reasonably relied on by experts in the field in forming opinions or inferences upon the subject, need not necessarily be admissible in evidence. Gulf South should have an opportunity in cross-examination of Magnolia's expert to attack the relevancy of this information. Therefore, suppression of such information would be inappropriate.

V.

City of Hattiesburg
In the order granting Gulf South's motions for summary judgment, the trial judge also granted the City's motions for summary judgment on the cross-claim of Gulf South and on Magnolia's claim. The record reflects that all witnesses deposed testified that the City had not been negligent in any way to either party concerning the pipe being laid off-grade. The express terms of the City's contract with each party imposed a duty on each to deliver a completed project which was eligible for EPA funding. Gulf South is also contractually obligated to indemnify the City against any claims brought against it by Magnolia. There are no genuine issues of material fact as to the City's involvement with Magnolia's negligence claim against Gulf South. The trial court correctly granted the City's motions for summary judgment.

CONCLUSION
Because the theory of joint tortfeasors and common law indemnity actions is misapplied in this case, because there are genuine issues of material fact concerning what inspection and supervision duties Gulf South assumed on the job site, and because there are genuine issues of material fact concerning what duty Gulf South owed Magnolia as defined by Gulf South's contract with the City, and concerning whether or not Gulf South breached that duty, we find that the trial court erred in granting Gulf South's motion for summary judgment. The trial court correctly granted the City's motions for summary judgment, since there is no evidence that the City breached any duty to either party. Therefore, we affirm in part, reverse in part, and remand for a plenary trial on the merits of Magnolia's negligence claim against Gulf South.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.